In the

# United States Court of Appeals

## For the Seventh Circuit

————————————

No. 25-3050

MARGARITO CASTAÑON-NAVA, *et al.*,

*Plaintiffs-Appellees*,

*v.*

U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,

*Defendants-Appellants*.

————————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:18-cv-3757 — **Jeffrey I. Cummings**, *Judge*.

————————————

ARGUED DECEMBER 2, 2025 — DECIDED DECEMBER 11, 2025

————————————

Before KIRSCH, LEE, and PRYOR, *Circuit Judges*.

LEE, *Circuit Judge*. In 2022, the Department of Homeland Security and the U.S. Immigration and Customs Enforcement ("Defendants") entered into a Consent Decree with Plaintiffs negotiated over the course of two different administrations. In this lawsuit, Plaintiffs' principal claim was that Defendants' practice of warrantlessly arresting individuals—absent probable cause that the subjects were likely to escape before warrants could be obtained—violated 8 U.S.C. § 1357(a)(2),

which governs immigration arrests effectuated without a warrant. And so, in the Consent Decree, Defendants agreed to issue a "Broadcast Statement of Policy" affirming "the underlying laws and policies applicable to all arrests effected under 8 U.S.C. § 1357(a)(2)," provide relevant training, and document compliance. Dkt. 155-1 at 5, 6, 17.[1]

In exchange, Defendants obtained a dismissal with prejudice and release of all related claims, "avoid[ing] the substantial expense, inconvenience, and distraction of further protracted litigation … and finally put[ting] to rest and terminat[ing]" the action. *Id.* at 2. Defendants do not challenge the validity of the original Consent Decree or the authority of the district court to enter it.

Instead, Defendants seek a stay pending appeal of two recent district court orders issued on October 7 and November 13, 2025. First, they challenge the district court's October 7 order extending the term of the Consent Decree by 118 days after finding that Defendants had failed to substantially comply with the Consent Decree. Second, Defendants seek to stay the district court's November 13 order requiring the release of 13 individuals, whom both parties agree were arrested in violation of § 1357(a)(2), as well as approximately 442 individuals who (in the district court's words) "it stands to reason" were "potentially" arrested in violation of § 1357(a)(2).

For the reasons explained below, Defendants' request for a stay pending appeal of these rulings is granted in part and denied in part. The request for a stay of the October 7

---

[1] "Dkt." refers to the docket number in the district court record.

extension order is denied. The request for a stay of the November 13 order is granted under the terms described below.

# I

## A. The Consent Decree

In 2018, Plaintiffs filed this class action against the Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), and various federal officials, alleging that they were arresting noncitizens without a warrant in violation of 8 U.S.C. § 1357(a)(2). This provision provides, in relevant part:

> Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have power without warrant … to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of [any law or regulation made in pursuance of law regulating the admission, exclusion, expulsion, or removal of aliens] and is likely to escape before a warrant can be obtained for his arrest ….

After several years of discovery and motion practice, the parties negotiated a settlement and signed the Consent Decree on November 29, 2021. On February 8, 2022, the district court granted final approval of the agreement, entered the Consent Decree, and certified the following class pursuant to Federal Rule of Civil Procedure 23(e): "All current and future persons arrested without a warrant for a civil violation of U.S. immigration laws within the area of responsibility of the ICE Chicago Field Office." Dkt. 158 at 4.

As part of the Consent Decree, Defendants agreed to issue a "Broadcast Statement of Policy" to all ICE officers affirming

ICE's obligations under § 1357(a)(2). Dkt. 155-1 at 6–7, 17–19. Defendants additionally agreed to adopt or amend current training materials to ensure compliance with § 1357(a)(2) and maintain records documenting warrantless arrests. *Id.* at 7–8.

The Consent Decree also laid out how the parties would address any future claims that Defendants had violated the terms of the Consent Decree. For example, in those instances where Plaintiffs believe that Defendants have arrested and detained an individual in violation of the agreement, they can raise the issue with Defendants and file a motion to enforce if the parties are unable to agree upon a resolution. *Id.* at 10–11. Furthermore, if Plaintiffs come to believe that Defendants have repeatedly and materially violated the Consent Decree, they can file a motion, after conferring with Defendants, and seek appropriate equitable relief from the court. *Id.* at 11. [2]

Under its terms, the Consent Decree was scheduled to expire on May 12, 2025, three years after its effective date. However, the parties agreed that it would only terminate on that date "absent a pending motion to enforce its terms." *Id.* at 5.

---

[2] Release as a remedy for class members comports with the remedy provided when someone is arrested in violation of federal law. *See Arias v. Rogers*, 676 F.2d 1139, 1142 (7th Cir. 1982) ("If the petitioners had been arrested illegally by [immigration] officers and carted off to jail and the [agency] had made no move to begin deportation proceedings, the petitioners would have been entitled to obtain their freedom through a habeas corpus proceeding because their detention would have violated the Fourth Amendment, which forbids 'unreasonable ... seizures,' including arrests, of persons whether or not they are citizens; and the immigration laws, specifically 8 U.S.C. § 1357(a)(2).").

**B. The October 7 Order**

On March 13, 2025, a few months before the scheduled termination date, Plaintiffs filed a motion to enforce, asserting that ICE had arrested 26 individuals in violation of § 1357(a)(2) and the Consent Decree. Dkt. 164.

On April 14, 2025, Plaintiffs also filed a motion to modify the final approval order enforcing the terms of the Consent Decree under Federal Rule of Civil Procedure 60(b)(5). Dkt. 177. In it, Plaintiffs requested that the court extend the Consent Decree by an additional three years in light of, in their view, Defendants' repeated material noncompliance. In response, Defendants argued that they had not violated the Consent Decree and that Plaintiffs had not satisfied Rule 60(b)(5)'s requirements to seek a modification of the Consent Decree. Dkt. 184.

While both motions were pending, a senior DHS official sent an email on June 11, 2025, unilaterally declaring that ICE's obligations under the Consent Decree were terminated:

> Despite a pending motion to enforce the settlement agreement and motion to extend the settlement agreement, it remains terminated. Accordingly, I hereby rescind the May 27, 2022, Castañon-Nava Settlement Obligation statement of policy.

Dkt. 193 at 1.

On October 7, 2025, the district court granted the enforcement motion in part, finding that 22 of the 26 individuals identified in the enforcement motion were arrested in violation of the Consent Decree. Noting that the 22 individuals had already been released, the only relief that remained were fees

and compliance certificates. Defendants do not challenge that ruling here.

In the same order, the district court also granted Plaintiffs' Rule 60(b)(5) request to modify the Consent Decree by extending it, although only in part. The district court agreed with Plaintiffs and found, after reviewing the factual record, that Defendants had failed to substantially comply with the Consent Decree. But it denied Plaintiffs' request to extend the Consent Decree by three years, concluding that an extension of 118 days was more appropriate. This, the court reasoned, was equal to the number of days between June 11, 2025—the date that Defendants announced they would stop abiding by the Consent Decree—and October 7, 2025, the date of the order's issuance. Thus, it ordered that the Consent Decree remain in effect until February 2, 2026.

## C. The November 13 Order

On October 20, 2025, Plaintiffs filed a Motion for Placement of Potential Class Members on Alternatives to Detention ("ATD motion"). Dkt. 219. The ATD motion was filed in response to Defendants' request for a two-month extension to produce certain documents Plaintiffs had requested regarding the arrest of numerous individuals whom Plaintiffs believed had been arrested in violation of the Consent Decree. Given the delay, Plaintiffs asked the court to order Defendants to place "each potential class member" arrested prior to October 7, 2025, on ankle monitors or other alternatives to detention. Dkt. 219-9 at 1. Defendants argued that release of these "potential" class members contravened the Consent Decree, which permitted release only when Plaintiffs could establish that the arrest in question violated the Consent Decree and § 1357(a)(2). Dkt. 227.

On November 7, 2025, the parties filed a joint status report, which identified 46 arrests that the parties agreed violated the Consent Decree. (By the time of the report, only 15 remained in custody).[3] At a hearing on November 12, 2025, the parties indicated that two additional individuals were no longer in detention and confirmed that there were 13 class members who had been arrested in violation of the Consent Decree and who remained in ICE detention. Defendants nevertheless opposed their release, asserting for the first time in this litigation that the 13 individuals, who were arrested without a warrant of any kind, were being detained pursuant to ICE's authority under 8 U.S.C. § 1225(b)(2)(A).[4]

On November 13, 2025, the district court ordered the release of the 13 individuals. It also granted Plaintiffs' broader request to release 615 individuals who potentially fell into the class, noting that "given the number of instances where the parties have agreed that the rights of the class members were violated, it stands to reason that a significant number of additional violations will be uncovered as plaintiffs receive and analyze the arrest records of the remaining arrestees." Dkt.

---

[3] Based upon the parties' submissions, 28 of the 46 were removed from the United States, either voluntarily or involuntarily. Three have been released on bond.

[4] That provision provides:

Subject to subparagraphs (B) and (C), in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title.

8 U.S.C. § 1225(b)(2)(A).

247 at 4. The district court ordered Defendants to release on bond, or other alternatives to detention, the 615 "potential class members," who are still detained and who do not pose a high risk of danger to the public. According to the parties, that number now stands at approximately 442.

## II

Before the court is Defendants' Emergency Motion to Stay the October 7 and the November 13 orders. Granting such a stay is "extraordinary relief." *See Somerville Pub. Schs. v. McMahon*, 139 F.4th 63, 68 (1st Cir. 2025); *Plaquemines Par. v. Chevron USA, Inc.*, 84 F.4th 362, 373 (5th Cir. 2023); *United States v. Mitchell*, 971 F.3d 993, 999 (9th Cir. 2020); *Citizens for Resp. & Ethics in Washington v. Fed. Election Comm'n*, 904 F.3d 1014, 1017 (D.C. Cir. 2018). And the standard for obtaining that relief is "demanding." *Camelot Banquet Rooms, Inc., v. U.S. Small Bus. Admin.*, 14 F.4th 624, 628 (7th Cir. 2021); *see Plaquemines*, 84 F.4th at 373 (noting that the movant must meet a "heavy burden").

When assessing a motion for a stay pending appeal, we consider: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). The first two factors "are the most critical." *Id.* at 434. We will discuss each in turn.

## A. Likelihood of Success on the Merits

### 1. The October 7 Order

Defendants first seek a stay of the district court's October 7 order modifying the Consent Decree to extend its term until February 2, 2026.[5] In Defendants' view, this relief violates 8 U.S.C. § 1252(f)(1), which provides:

> Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter [8 U.S.C. §§ 1221–1232], as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

Section 1252(f)(1)'s injunction bar is implicated here, Defendants argue, because the court's order restrains their ability to arrest and detain individuals under 8 U.S.C. §§ 1225 and 1226. Defendants' invocation of § 1252(f)(1), however, runs into two significant hurdles at this stage in the litigation.

### a. Waiver

First, by entering into the Consent Decree in their quest to dismiss the underlying action with prejudice, Defendants

---

[5] In their papers, Defendants do not challenge the district court's October 7 ruling on the enforcement motion. This makes sense because, at the time of the ruling, the individuals in question had already been released.

likely waived their § 1252(f)(1) argument about warrantless arrests. Indeed, well before Defendants agreed to be bound by the Consent Decree, they had raised this exact argument before the district court on at least two separate occasions. *See* Dkt. 27 at 13–14 (opposition to class certification); Dkt. 66-1 at 14–15 n.5 (motion to dismiss). But Defendants later abandoned this argument to obtain the benefits of settlement.[6] This is a textbook example of an "intentional relinquishment of a known right." *Miller v. Willow Creek Homes, Inc.*, 249 F.3d 629, 631 (7th Cir. 2001); *see United States v. Armour & Co.*, 402 U.S. 673, 681 (1971) ("Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms.").

Defendants resist this conclusion, contending that § 1252(f)(1) is jurisdictional and, therefore, unwaivable. The Supreme Court, however, has held that, despite its verbiage, § 1252(f)(1) does not limit a federal court's subject matter jurisdiction. *Biden v. Texas*, 597 U.S. 785, 797–801 (2022). Rather, § 1252(f)(1) only constrains the ability of a federal court (other than the Supreme Court) to grant injunctive relief on a class-wide basis. *Id.* at 801. And, while it is true that the Supreme Court in *Biden* declined to decide whether § 1252(f)(1) is waivable, *id.* at 801 n.4, there is ample reason to believe that it is, given that similar rules limiting the power of the federal

---

[6] Notably, Defendants also failed to raise this § 1252(f)(1) argument in their opposition to Plaintiffs' Rule 60(b)(5) motion to modify, thereby waiving it a second time. *See Wheeler v. Hronopoulos*, 891 F.3d 1072, 1073 (7th Cir. 2018) ("Failing to bring an argument to the district court means that you waive that argument on appeal.") (citing *United Cent. Bank v. Davenport Est. LLC*, 815 F.3d 315, 318 (7th Cir. 2016), and *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012)).

courts are waivable. *See, e.g., Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999) (personal jurisdiction is waivable); *Hoffman v. Blaski*, 363 U.S. 335, 343 (1960) ("[V]enue, like jurisdiction over the person, may be waived."); *Pusey & Jones Co. v. Hanssen*, 261 U.S. 491, 500 (1923) (objection to equitable jurisdiction is waivable); *Sossamon v. Texas*, 563 U.S. 277, 284 (2011) (state sovereign immunity is waivable). Thus, we believe that it will be difficult for Defendants to overcome Plaintiffs' argument that Defendants waived their § 1252(f)(1) objection when it comes to warrantless arrests, both by entering into the Consent Decree and later failing to raise it in their opposition to Plaintiffs' Rule 60(b)(5) motion to modify.[7]

Our colleague cautions against the use of waiver against governmental entities and believes that, before we hold Defendants to the commitments outlined in the Consent Decree, which was negotiated and signed during two prior administrations (although we note that one was President Trump's first term), we must consider whether doing so would be prudent given the concerns over democratic disempowerment expressed in *Horne v. Flores*, 557 U.S. 433, 447–50 (2009), and *Evans v. City of Chicago*, 10 F.3d 474, 478–79 (7th Cir. 1993) (plurality opinion). Is it wise, our colleague asks, to use consent decrees to hold one administration to the commitments (and waivers) of another?

---

[7] By contrast, we believe as a preliminary matter that it is less likely that, by entering into a consent decree requiring compliance with § 1357(a)(2) for warrantless arrests, Defendants also waived a § 1252(f)(1) challenge as to the manner in which it effectuates arrests pursuant to I-200 warrants issued under § 1226(a).

This concern is not an unreasonable one. Although the opposite proposition, that is, holding that a consent decree or settlement agreement to which a governmental entity is a party can *never* bind future administrations, raises its own thorny problems. Of course, as our colleague alluded to at oral argument, one can imagine a scenario where one elected official might seek to connive with like-minds to embed a controversial policy within a consent decree in order to bind future ones. *See also Horne*, 557 U.S. at 449 (making the same observation). Luckily, hypotheticals of that sort are subject to the reality that federal judges, obligated "to say what the law is," do not merely rubber stamp consent decrees. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803); *cf. Horne*, 557 U.S. at 450 ("It goes without saying that federal courts must vigilantly enforce federal law and must not hesitate in awarding necessary relief."). Nevertheless, Defendants have not raised the arguments our colleague has proffered here. And "[i]n our adversarial system of adjudication, we follow the principle of party presentation," where the parties "'frame the issues for decision,' while the court serves as 'neutral arbiter of matters the parties present.'" *Clark v. Sweeney*, 607 U.S. ----, No. 25-52, 2025 WL 3260170, at *1 (U.S. Nov. 24, 2025) (per curiam) (first quoting *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020); and then quoting *Greenlaw v. United States*, 554 U.S. 237, 243 (2008)). Put another way, it is difficult to conclude that Defendants are likely succeed on an argument they did not raise either before us or even before the district court below.

In any event, *Horne* and *Evans* recognize at least two mechanisms to prevent such abuse, both of which apply here. The first is the availability of Rule 60(b)(5), which allows a party to seek modification of a consent decree when "applying it

prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5); *see Horne*, 557 U.S. at 447. Defendants did not take that approach. *Contra id.* at 439–40, 452–56 (discussing the government's Rule 60(b)(5) motion to modify a consent decree because changed circumstances rendered enforcement of the decree no longer equitable). The second is ensuring that any enforcement of a consent decree is grounded "on the existence of a substantial claim under federal law." *Evans*, 10 F.3d at 480; *see Horne*, 557 U.S. at 450. Here, Plaintiffs have made that showing under § 1357(a)(2), the statute at the heart of the Consent Decree. And Defendants do not challenge the validity of the Consent Decree or the authority of the district court to enter it.

### b. The extension order does not violate § 1252(f)(1).

But, even assuming § 1252(f)(1) is not waived here, Defendants are not likely to succeed on their argument that the district court's modification of the Consent Decree is invalid under § 1252(f)(1). Recall that this provision only applies to injunctive relief that "enjoin[s] or restrain[s] the operation of 8 U.S.C. §§ 1221 through 1232." The Consent Decree, on the other hand, is focused squarely on Defendants' compliance with § 1357(a)(2).

Defendants disagree, arguing that extending the Consent Decree will impede ICE's operation under § 1226 by limiting its ability to arrest individuals pursuant to field-issued I-200 warrants (which, in their view, are proper under § 1226 and its implementing regulations). But, based on this preliminary record, we read the Consent Decree to cover only those individuals whose arrests are effectuated in the absence of any warrant (I-200 or otherwise).

It is possible that the extension of the Consent Decree could result in ICE choosing to rely more on field-issued I-200 warrants (as it appears to have done), thereby indirectly influencing the way the agency employs § 1226, but such collateral effects do not run afoul of § 1252(f)(1). *See Garland v. Aleman Gonzalez*, 596 U.S. 543, 553 n.4 (2022) (remarking that a case "stands at most for the unresponsive proposition that a court may enjoin the unlawful operation of a provision *that is not specified in § 1252(f)(1)* even if that injunction has some collateral effect on the operation of a covered provision") (emphasis in original); *Texas v. U.S. Dep't of Homeland Sec.*, 123 F.4th 186, 209–11 (5th Cir. 2024); *Al Otro Lado v. Exec. Off. for Immigr. Rev.*, 138 F.4th 1102, 1124 (9th Cir. 2025), *cert. granted on other grounds sub nom. Noem v. Al Otro Lado*, No. 25-5, 2025 WL 3198572 (U.S. Nov. 17, 2025); *Gonzalez v. U.S. Immigr. & Customs Enf't*, 975 F.3d 788, 812–15 (9th Cir. 2020).[8]

On the other hand, we believe that Defendants are likely to succeed on their argument that the district court ran afoul of § 1252(f)(1) when it rejected ICE's use of field-issued I-200

---

[8] Defendants cite to *N.S. v. Dixon*, 141 F.4th 279, 288–89 (D.C. Cir. 2025), but that case is distinguishable. There, the district court had held that the U.S. Marshals lacked authority to make civil immigration arrests. It then permanently enjoined the Marshals "from arresting and detaining criminal defendants in the Superior Court for the District of Columbia for suspected civil immigration violations." *Id.* at 284. The D.C. Circuit agreed that the Marshals lacked the authority to arrest but reversed the injunction, reasoning that "[a]n injunction that restrains the Government from carrying out an arrest and detention of a criminal defendant pursuant to an I-200 form clearly affects provisions to which § 1252(f)(1) applies." *Id.* at 289. Unlike *N.S.* which involved I-200 warrants made pursuant to § 1226, a covered provision, the Consent Decree only addresses warrantless arrests made pursuant to § 1357(a)(2).

warrants and re-classified the arrests made pursuant to these warrants as warrantless ones. As we have explained, we do not read the Consent Decree to reach arrests effectuated pursuant to a warrant, and the Supreme Court held in *Aleman Gonzalez* that § 1252(f)(1) bars an inferior court from class-wide injunctive relief that would interfere with ICE's operation of § 1226, even if the court believes the government's application of the provision is unlawful. 596 U.S. at 550–51.

Here, the district court found that ICE had implemented a policy of issuing defective I-200 warrants in the field for the express purpose of avoiding its obligation under § 1357(a)(2) and the Consent Decree.[9] But, even so, § 1252(f)(1) prohibits it from remedying such conduct with class-wide injunctive relief. In short, the Consent Decree permissibly provides class-wide injunctive relief as to warrantless arrests under § 1357(a)(2); however, it cannot provide such relief to those arrested with warrants issued under § 1226, even defective ones.[10]

---

[9] This factual finding is supported by the record and is not clearly erroneous. The district court referenced, among other things, an ICE Academy training presentation which stated, "Officers may also carry a blank form I-200 for the arrest of each collateral so that an individual flight risk analysis is not needed." Dkt. 185-2 at 4.

[10] Of course, an individual arrested pursuant to a field-issued I-200 warrant can challenge the validity of the warrant in federal court on an individual basis (for example, in a habeas proceeding), but he cannot do so in this class action.

### c. The district court did not abuse its discretion.

Despite its discussion of I-200 warrants, the district court likely did not err when it granted Plaintiffs' Rule 60(b)(5) motion to modify the Consent Decree by extending it, at least as to warrantless arrests.

A party may move to modify a consent decree under Rule 60(b)(5). To succeed, the movant, as relevant here, bears the burden to establish the defendant has failed to substantially comply with the terms of the decree. *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 383 (1992); *see also Kelly v. Wengler*, 822 F.3d 1085, 1098 (9th Cir. 2016) ("Under well established law, substantial violation of a court order constitutes a significant change in factual circumstances."). If the movant makes that showing, we consider "whether the proposed modification is suitably tailored to the changed circumstance." *Rufo*, 502 U.S. at 383. We review a district court's decision to grant or deny a Rule 60(b)(5) motion for abuse of discretion. *Shakman v. Clerk of Cook Cnty.*, 994 F.3d 832, 840 (7th Cir. 2021).

Here, even putting its rejection of the I-200 warrants to the side, the district court cited multiple instances where Defendants had failed to comply with the Consent Decree while making warrantless arrests (that is, arrests without a warrant of any kind, defective or otherwise). It also relied on the unilateral proclamation by a DHS senior official on June 11, 2025 that DHS would no longer comply with the Consent Decree. Accordingly, we cannot say that the district court abused its discretion when finding that Defendants' substantial noncompliance with the Consent Decree constituted a significant change in circumstances that warranted a modification of the Consent Decree under Rule 60(b)(5). *See Siddiqui v. Nat'l Ass'n of Broad. Emps. & Technicians*, 132 F.4th 530 (7th Cir. 2025) ("A

district court abuses its discretion 'if it reaches an erroneous conclusion of law ... or reaches a conclusion that no evidence in the record supports as rational.'") (quoting *In re Stericycle Sec. Litig.*, 35 F.4th 555, 559 (7th Cir. 2022)); *United States v. Carlberg*, 108 F.4th 925, 930 (7th Cir. 2024) ("We will find an abuse of discretion if there is no evidence in the record on which the district court could have rationally based its decision.") (citation omitted).

Furthermore, the court's modification was reasonable and narrowly tailored to the violation. Indeed, the district court rejected Plaintiffs' request for a three-year extension and instead extended the Consent Decree by only 118 days, the period between June 11, 2025 (the date of the DHS email) and October 7, 2025 (the date of the order's issuance).[11]

For these reasons, even assuming they had not waived their § 1252(f)(1) objection as to warrantless arrests, Defendants have not met their burden on this record to show a likelihood of success as to their argument that the 118-day extension of the Consent Decree was an abuse of discretion.

## 2. The November 13 Order

In its November 13 order, the district court mandated the release of 13 individuals whom the parties agreed were arrested in violation of the Consent Decree. It also granted Plaintiffs' ATD motion and ordered the release of over 600 "potential class members" so long as Defendants had not

---

[11] Our colleague faults the district court for not taking "a more careful approach" to consider the concerns regarding "democratic governance" raised in *Horne* and *Evans*, but we do not see how the district court could have abused its discretion by failing to address an argument Defendants failed to raise in the first place. *See Wheeler*, 891 F.3d at 1073.

designated them to be high public-safety risks. At oral argument, counsel estimated that approximately half of the remaining 442 were arrested pursuant to field-issued I-200 warrants, while the other half were arrested without any warrant.[12]

In their motion to stay, Defendants contend that the release orders are barred by § 1252(f)(1). As to those arrested with I-200 warrants, Defendants argue that the order impermissibly infringes upon their operations under § 1226 in contravention of § 1252(f)(1) and *Aleman Gonzalez.* We believe that Defendants have demonstrated a likelihood of success on this argument for the reasons already explained.

As for those who were arrested without any warrant whatsoever, Defendants insist that the release orders still contravene § 1252(f)(1) because Defendants are detaining those individuals pursuant to their mandatory detention authority authorized by § 1225(b)(2)(A). *See* 8 U.S.C. § 1225(b)(2)(A) ("Subject to subparagraphs (B) and (C), in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title.").

As an initial matter, there is a strong argument that Defendants waived this argument as well when they decided to enter into the Consent Decree (albeit Defendants did raise it

---

[12] We cannot tell from the present record whether the 13 individuals identified in the November 13 order were arrested pursuant to an I-200 warrant or subjected to warrantless arrests.

prior to the November 13 order). But the argument is likely to fail on the merits too.

The question is whether § 1225(b)(2)(A) covers any noncitizen who is unlawfully already in the United States as well as those who present themselves at its borders. For their part, Plaintiffs highlight a host of cases where courts have held that ICE's authority to detain a noncitizen discovered within the country derives from § 1226(a) and not from § 1225(b). *See* 8 U.S.C. § 1226(a) ("On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States."); *see* , *e.g.*, *Corona Diaz v. Olson*, No. 25-CV-12141, 2025 WL 3022170 (N.D. Ill. Oct. 29, 2025); *Hasan v. Crawford*, No. 1:25-CV-1408 (LMB/IDD), 2025 WL 2682255 (E.D. Va. Sept. 19, 2025); *Lopez Benitez v. Francis*, 795 F. Supp. 3d 475 (S.D.N.Y. 2025). Based upon the text and structure of the two provisions, we believe that Plaintiffs have the better argument on the current record.

That's because § 1225(a)(1) defines an "applicant for admission" as "an alien present in the United States who has not been admitted or who arrives in the United States." 8 U.S.C. § 1225(a)(1). And while a noncitizen arrested in the Midwest might qualify as "an alien present in the United States who had not been admitted," § 1225(a)(1), the mandatory detention provision upon which Defendants rely, limits its scope to an "applicant for admission" who is "seeking admission," § 1225(b)(2)(A). Put another way, "U.S. immigration law authorizes the Government to detain certain aliens *seeking admission* into the country under §§ 1225(b)(1) and (b)(2). It also authorizes the Government to detain certain aliens *already in the country* pending the outcome of removal proceedings under

§§ 1226(a) and (c)." *Jennings v. Rodriguez*, 583 U.S. 281, 289 (2018) (emphasis added). Accordingly, given the factual record before us, we conclude that Defendants are not likely to succeed on the merits of their argument that those individuals, whom ICE arrested in Chicago without a warrant, are subject to mandatory detention under § 1225(b)(2)(A).

Defendants disagree. In their view, an "applicant for admission" is synonymous with a person "seeking admission" because, as they put it, one cannot apply for something without also seeking it. And, admittedly, this argument has some superficial appeal. After all, a person does not apply for something they are not seeking. Moreover, § 1225(a)(3), which Defendants point to, refers to noncitizens "who are applicants for admission or *otherwise* seeking admission," 8 U.S.C. § 1225(a)(3) (emphasis added), suggesting that "applicants for admission" are those "seeking admission." But it is Congress's prerogative to define a term however it wishes, and it has chosen to limit the definition of an "applicant for admission" to "an alien present in the United States who has not been admitted or who arrives in the United States." 8 U.S.C. § 1225(a)(1). It could easily have included noncitizens who are "seeking admission" within the definition but elected not to do so.

What is more, Defendants' construction would render § 1225(b)(2)(A)'s use of the phrase "seeking admission" superfluous, violating one of the cardinal rules of statutory construction. *See United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 432 (2023) ("[E]very clause and word of a statute should have meaning."). Indeed, as the Supreme Court reminds us, if an interpretation of one provision "would render another provision superfluous, courts

presume that interpretation is incorrect." *Bilski v. Kappos*, 561 U.S. 593, 607–08 (2010). And this presumption is "strongest when an interpretation would render superfluous another part of the same statutory scheme," as would be the case here. *Marx v. Gen. Rev. Corp.*, 568 U.S. 371, 386 (2013).

Furthermore, the difference in treatment between a noncitizen at the border and one already in the United States fits within the broader context of our immigration law. Indeed, "[t]he distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001); *Leng May Ma v. Barber*, 357 U.S. 185, 187 (1958). ("[O]ur immigration laws have long made a distinction between those aliens who have come to our shores seeking admission ... and those who are within the United States after an entry, irrespective of its legality.").[13]

Thus, we conclude on this preliminary record that Defendants are not likely to succeed on the merits of their argument that those individuals, whom ICE arrested without a warrant,

---

[13] It also does not escape our notice that Defendants' recent reliance on § 1225(b)(2)(A) to detain noncitizens discovered within the United States upends decades of practice. "Before July 8, 2025, DHS's long-standing interpretation had been that § 1226(a) applied to those who have crossed the border between ports of entry and are shortly thereafter apprehended." *Hasan*, 2025 WL 2682255, at *9 (citation modified). Mandatory detention of all persons illegally in the United States only became official DHS policy when Acting Director of ICE Todd M. Lyons issued an internal memorandum on July 8, 2025 explaining that the agency "revisited its legal position" on the applicability of §§ 1225(b) and 1226(a). *Id.* (citation omitted).

are subject to mandatory detention under § 1225(b)(2)(A).[14] Moreover, their release under the terms of the Consent Decree would not violate § 1252(f)(1) because their arrests were not based on I-200 warrants (defective or not) and the effects on § 1226 are collateral at best for the reasons we have explained. As a result, the release orders as to these detainees are not barred by § 1252(f)(1). But this does not end our analysis.

Even though we conclude as a preliminary matter that § 1252(f)(1) poses no obstacle to the release of those detainees who faced warrantless arrests, we believe that Defendants have a strong argument that the district court lacked the authority to order the release of the 442 "potential" class members under the terms of the Consent Decree. In Section IV(E) of the Consent Decree, the parties agreed that a detained class member would be released from ICE custody "upon a determination by the parties or the Court … that [the] Class Member was so arrested contrary to the terms of the Agreement." Dkt. 155-1 at 9. Here, no such determination has been made

---

[14] To the extent that Defendants believe they can trigger § 1252(f)(1) merely by invoking § 1225(b) at the eleventh hour, even if it is wholly inapplicable to the cirumstances at hand, they are mistaken. *See Texas*, 123 F.4th at 210 (noting that, despite DHS's contention that a wire barrier would impede its ability to detain noncitizens pursuant to its authority under §§ 1225 and 1226, the federal agency defendants were not "the ultimate judges of whether § 1252(f)(1)'s bar applies"). Defendants do not point us to anything in the factual record to support their contention that the individuals in question were in fact arrested and detained pursuant to § 1225(b)(2)(A). And Defendants cannot insulate themselves from judicial review regarding the applicability of § 1252(f)(1) simply by pointing to a covered statute and claiming that it applies without any factual support. *Id.* at 210–11 (rejecting DHS's reliance on § 1252(f)(1) when the factual record did not support it).

for the approximately 442 "potential class members" who were the subject of the November 13 order.

Nor do we think the discretion the court retained under Section V(B)(2) to "provide any equitable remedies not otherwise specified in this Agreement" would override the specific remedy the parties agreed to in Section IV(E). Thus, even as to those individuals who were arrested without a warrant, we believe that Defendants have a strong argument that the "potential class members" cannot be released absent individual determinations as required under Section IV(E).

To sum up, we conclude that Defendants have not established a likelihood of success on the merits as to their argument that the district court's October 7 order extending the term of the Consent Decree until February 2, 2026 violated § 1252(f)(1). However, Defendants have demonstrated that they are likely to succeed on their argument that the November 13 order requiring the release of individuals, who were arrested pursuant to I-200 warrants, contravened § 1252(f)(1)'s class-wide injunction bar. As for those individuals who were arrested without a warrant, we believe that Defendants are not likely to succeed on their argument that these individuals are subject to mandatory detention under § 1225(b)(A)(2), but Defendants are likely to successfully argue that the district court exceeded its authority when ordering their release before making an individualized determination that they were arrested in violation of the Consent Decree as required by Section IV(E).

## B. Irreparable Harm

Turning first to the October 7 modification order, Defendants do not persuasively explain how they would suffer

irreparable harm from having to comply with a consent decree to which they knowingly and willingly agreed, particularly when the district court found that Defendants had repeatedly violated it and limited the extension to cover only those days after Defendants' unilateral declaration of noncompliance. Notably, Defendants did not file their own Rule 60(b)(5) motion asking the court to modify or terminate the Consent Decree, *contra Horne*, 557 U.S. at 439–40, 452–56, nor do they dispute its validity and enforceability. It is difficult to see, then, how extending it by a time equal to Defendants' period of substantial noncompliance could constitute irreparable harm.

Defendants protest, contending that "[w]henever the Government is enjoined by a court order, it suffers irreparable sovereign harm." Defs.' Stay Motion at 19 (citing *Trump v. CASA, Inc.*, 606 U.S. 831, 860–61 (2025)). This statement not only overstates the holding in *CASA*, but *CASA* itself is distinguishable on numerous grounds. First, of course, Defendants here voluntarily undertook the obligations set forth in the Consent Decree; *CASA* involved nothing of the sort. Second, *CASA* involved a universal injunction that prevented the government from enforcing its policies against nonparties; this case involves a Rule 23 class action. *See CASA*, 606 U.S. at 869 (Kavanaugh, J., concurring) (recognizing that *CASA* does not foreclose plaintiffs from seeking injunctive relief via Rule 23 class actions). Third, the Supreme Court in *CASA* premised its irreparable harm analysis on its determination that the government was likely to prevail on its argument that the Judiciary Act barred universal injunctions. *See id.* at 860 ("The question before us is whether the Government is likely to suffer irreparable harm from the District Courts' entry of injunctions that likely exceed the authority conferred by the

Judiciary Act."). By contrast, Defendants' argument that the October 7 modification order contravenes § 1252(f)(1) is not likely to succeed. Finally, in *CASA*, the Supreme Court referenced Chief Justice Roberts's statement in *Maryland v. King* that "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." 567 U.S. 1301, 1303 (2012) (Roberts, C. J., in chambers) (citation modified). But, here, the Consent Decree requires—rather than enjoins—Defendants' compliance with a federal statute, § 1357(a)(2).

That said, we agree that Defendants will suffer irreparable harm if the district court's November 13 order requiring the release of individuals who were arrested pursuant to field-issued I-200 warrants is not stayed. Section 1252(f)(1) proscribes inferior federal courts from issuing class-wide injunctive relief that would impede the agency's enforcement operations pursuant to its authority under § 1226. In this instance, the Supreme Court's citation in *CASA* to *Maryland v. King* is apt. *See Noem v. Vazquez Perdomo*, No. 25A169, 2025 WL 2585637, at *3 (U.S. Sept. 8, 2025) (Kavanaugh, J., concurring) (noting, "any time that the Government is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers from a form of irreparable injury.") (quoting *CASA*, 606 U.S. at 861) (citation modified)).

Similarly, we believe that Defendants will suffer irreparable harm if the district court's November 13 order mandating the release of individuals, who were arrested without a warrant, prior to individual violation determinations is not stayed. After all, this is not the bargain Defendants agreed to, and the Consent Decree carefully maps out what the district judge can or cannot order, balancing Defendants'

immigration enforcement responsibilities, Defendants' obligations to comply with § 1357(a), and the need to maintain public safety.

## C. Remaining Factors

Turning to the remaining *Nken* factors, we conclude that staying the October 7 order's extension of the Consent Decree will substantially injure individuals who have been or will be subjected to warrantless arrests without probable cause in violation of § 1357(a)(2) during the extended period of the Consent Decree—the very harm it is intended to prevent. *See Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th Cir. 1978) (ongoing violation of individual rights "constitutes proof of an irreparable harm").

Lastly, the public interest factor is neutral. On the one hand, "control over matters of immigration is a sovereign prerogative, largely within the control of the executive and the legislature." *Landon v. Plasencia*, 459 U.S. 21, 34 (1982). On the other, "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)); *see also Preston*, 589 F.2d at 303 n.3 (remedy for ongoing violations of individual rights "certainly would serve the public interest").

## III

As we have noted, due to the nascent nature of this appeal, our conclusions today are preliminary and based on the limited record available to us. We have every confidence that the parties will present more fulsome arguments and a more comprehensive record when we address the appeal on the

merits. That said, for the reasons explained above, Defendants' request to stay the October 7 order granting Plaintiffs' Rule 60(b)(5) motion to modify the Consent Decree is DENIED. Turning to the 13 class members and approximately 442 "potential class members" who are the subject of the November 13 order, as to those individuals who were arrested pursuant to an I-200 warrant, Defendants' request to stay the November 13 order pending appeal is GRANTED. As to those individuals, who were arrested absent a warrant, Defendants' motion to stay the November 13 order is GRANTED pending individual violation determinations pursuant to Section IV(E) of the Consent Decree.[15]

During oral argument, Defendants requested that the court stay this order for 14 days to permit Defendants to seek emergency relief from the Supreme Court, if necessary. That request is GRANTED.

An expedited briefing schedule and oral argument date will be set by separate order.

---

[15] Again, it is unclear whether the 13 individuals discussed in the November 13 order were arrested with or without warrants. The district court is in a much better position to make this assessment. Accordingly, we leave this, as well as any further individual proceedings under Section IV(E) of the Consent Decree, to the district court.

KIRSCH, *Circuit Judge*, dissenting. Through a consent decree, one branch of the federal government (the executive) handed over to another (the judiciary) the power to enforce compliance with part of the nation's immigration laws. Judicial enforcement of such an agreement requires flexibility. See *Horne v. Flores*, 557 U.S. 433, 447–50 (2009). When asked to bind current elected officeholders to the policy preferences of their predecessors, judges must allow maximum room for democratic governance. *Evans v. City of Chicago*, 10 F.3d 474, 479 (7th Cir. 1993) (en banc) (plurality opinion). Ambiguities in these agreements should be read in this light, and courts should "hesitate to assume that by signing a consent decree the government knowingly bartered away important public interests merely to avoid the expense of a trial." *All. to End Repression v. City of Chicago*, 742 F.2d 1007, 1013, 1019 (7th Cir. 1984) (en banc). The majority and the district court ignore these concerns in favor of the policy preferences of the last administration. In doing so, the district court also provided class-based injunctive relief in violation of the Immigration and Nationality Act (INA). Because both of the district court's orders should be stayed in their entirety, I dissent.

I

A

The consent decree centers on just one part of the federal immigration laws: plaintiffs gave up their litigation in exchange for the government's promise to follow 8 U.S.C. § 1357(a)(2). That provision says that a warrantless arrest of an alien must be based on facts showing that the alien is in violation of immigration laws and is likely to escape before a warrant can be obtained. When plaintiffs moved to enforce and modify the agreement based on alleged violations, the

government claimed that Immigration and Customs Enforcement (ICE) had held up its end of the bargain. The district court disagreed, but not based on § 1357(a)(2). Rather, the district court found that ICE was using entirely different statutes (8 U.S.C. §§ 1225 and 1226) to circumvent the agreement. To give effect to what it perceived to be plaintiffs' and the prior administration's intent when they entered into the agreement, the district court extended the consent decree's expiration date and ordered the release of hundreds of detained aliens. As an added kicker, the district court gave the released detainees a 24-hour reprieve from further arrest.

To understand where the district court went wrong, start with the October 7 order. Based on a set of recent ICE arrests in the Chicago area, plaintiffs moved to enforce and modify the consent decree. While the parties agreed that some of ICE's arrests fell under § 1357, the government argued that others weren't warrantless arrests at all because its agents had issued field warrants (referred to as I-200s) on the spot, and made those arrests on authority from a different statute—8 U.S.C. § 1226. The court concluded that the I-200 arrests were unlawful and in violation of the agreement. Put another way: to give force to an agreement about one part of the immigration laws (§ 1357), the district court decided the legality of an ICE practice involving another provision (§ 1226). Based in part on the violations of § 1226 as the district court saw them, it extended the decree by almost four months, barring the government from using its authority under § 1226 to make I-200 warrant-based arrests.

Something similar happened a month later. In the November 13 order, the district court considered plaintiffs' request to release potential class members as a remedy for the

government's violations of the consent decree. The agreement
said that class members arrested in violation of the decree and
not subject to mandatory detention—as relevant here, defined
by 8 U.S.C. § 1225(b)(2)(A)—should be released. The govern-
ment argued that, under a new interpretation of § 1225, many
of the arrestees at issue were subject to mandatory detention
and could not be released. The district court rejected the gov-
ernment's interpretation. Without conducting individualized
determinations as to whether the detainees were in the class
or if their arrests violated the agreement, the district court or-
dered the release of hundreds of people—including those the
government believes § 1225 requires it to detain.

Were this consent decree between two private parties, the
choice to interpret and enforce the agreement in this way
might have been appropriate. But this consent decree isn't be-
tween two private parties. Temporary officeholders of the ex-
ecutive branch—not the United States itself—entered into the
agreement. See *Evans v. City of Chicago*, 10 F.3d 474, 478 (7th
Cir. 1993) (en banc) (plurality opinion). Enforcing the prom-
ises of those elected officials requires an awareness that
"[t]oday's lawmakers have just as much power to set public
policy as did their predecessors," and that "democracy does
not permit public officials to bind the polity forever." *Id.*
"Recognition of the uniqueness of [institutional reform litiga-
tion] *must* inform [the] decision whether to grant or deny" a
motion to modify a consent decree involving a branch of gov-
ernment. *Shakman v. City of Chicago*, 426 F.3d 925, 934 (7th Cir.
2005) (emphasis added). And when elected officials make
promises about executive power, a court interpreting and en-
forcing such promises should do so with "due regard for the
separation of powers, the flexibility of equity, the ambiguity
of the decree … the sensitivity and importance of the subject

matter, and the limitations of judicial competence." *All. to End Repression v. City of Chicago*, 742 F.2d 1007, 1019 (7th Cir. 1984) (en banc).

The majority contends that the government never raised these concerns, and so we ought to turn a blind eye to them now. Ante at 12 (citing *Clark v. Sweeney*, 607 U.S. ----, No. 25-52, 2025 WL 3260170, at *1 (U.S. Nov. 24, 2025)). Yet while the government may not have used the words "separation of powers" or cited our precedent in this area, it adequately raised these issues. The government noted that the agreement was entered by a previous administration, and that "[t]he district court's orders interfere with the Executive's immigration enforcement operations." What's more, the "party presentation principle is supple, not ironclad." *United States v. Sineneng-Smith*, 590 U.S. 371, 376 (2020). And we retain "the independent power to identify and apply the proper construction of governing law." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991). The government raised this argument in general terms, and—given its significance—we should confront the constitutional dimensions of this case.

Plaintiffs settled in exchange for a promise that the government would conduct warrantless arrests in compliance with § 1357—not follow their preferred interpretation of other parts of the immigration laws. Put differently, government compliance with § 1357 is the only "substantial claim under federal law" that supports the continued existence of this decree. *Evans*, 10 F.3d at 480 (plurality opinion) ("[E]ntry and continued enforcement of a consent decree regulating the operation of a governmental body depend on the existence of a substantial claim under federal law.").

Relying on equitable discretion, the district court went way beyond § 1357. Its orders mean that the government's consent in 2022 tied ICE's hands not merely as to § 1357, but also as to other parts of the immigration laws: §§ 1225 and 1226. The orders require the government to comply with the previous administration's views of mandatory detention under § 1225, and bar ICE from using warrants in a way the government believes is lawful under § 1226. We need not decide if the district court was right about the meaning of these statutes. But it was wrong about how much flexibility the executive branch is due when it gives up enforcement authority to the judiciary. The district court should have taken a more careful approach. See *All. to End Repression*, 742 F.2d at 1013–20 (narrowly interpreting a consent decree to avoid "a premature confrontation between the judicial and executive branches"); *Evans*, 10 F.3d at 477–80 (plurality opinion). Because these orders went beyond what was reasonable and necessary to implement § 1357, the government is likely to succeed on the merits by establishing that district court abused its discretion in modifying the consent decree.

B

That another federal law blocks courts from granting the relief at issue underscores the district court's errors. The INA—8 U.S.C. § 1252(f)(1)—strips courts of "jurisdiction or authority" to grant class-based relief that enjoins or restrains the operation of §§ 1225 and 1226. An order enjoins or restrains the operation of a law when it requires federal officials to take actions that (in the government's view) are not required, or to refrain from actions that (again, in the government's view) are allowed. *Garland v. Aleman Gonzalez*, 596 U.S. 543, 551 (2022). Crucially, § 1252(f)(1)'s injunction bar applies

to class-based relief regardless of whether a court is right about the meaning of the underlying provisions. See *id.* at 552–53. Put another way, the government is allowed to be wrong about what §§ 1225 and 1226 require and authorize, and a court is not allowed to block the government from enforcing its preferred interpretation of those laws unless the court does so on an individual basis. *Id.* The district court's orders in this case violate the INA's injunction bar—they require ICE to refrain from executing warrant arrests and detaining aliens in ways that the government believes to be permissible under §§ 1226 and 1225.

The majority wrongly asserts that the government is barred from raising § 1252(f)(1) as applied to the motion to modify the decree and the meaning of mandatory detention in the agreement because it didn't raise the issue in 2022 or oppose the motion to modify. Ante at 9–11 & n.6, 18–19. That cannot be right. Entering a consent decree three years ago is not a waiver of a § 1252(f)(1) objection to unforeseen injunctions that target provisions outside the four corners of the consent decree. And even if the government forfeited this argument as to the October 7 order, see *id*. at 10 n.6, we should still reach it because (as discussed above) it is "founded on concerns broader than those of the parties." *Wood v. Milyard*, 566 U.S. 463, 471 (2012) (citation modified); *United States v. Ford*, 683 F.3d 761, 768 (7th Cir. 2012) (same).

The majority ties itself into knots attempting to explain why § 1252(f)(1) doesn't bar the district court's orders. Acknowledging that the October 7 order runs afoul of § 1252(f)(1) by declaring the illegality of ICE's I-200 warrant procedure, the majority nonetheless finds that the order should stand because the warrant-based arrests weren't the

court's only reason for extending the consent decree. Ante at 16–17. But it's not clear that the district court would have extended the decree absent the violations it found based on I-200 arrests. And while the majority attempts to bar the district court from providing injunctive relief enjoining § 1226 going forward, *id.* at 14–15, the surer course (especially in light of the separation of powers concerns discussed above) is to simply grant the stay. Part of the district court's rationale for extending the decree was faulty: it enjoined the government from conducting warrant-based arrests in a way the government believes to be lawful. That's impermissible relief under § 1252(f)(1), and it means the modification of the decree in the October 7 order was an abuse of discretion.

The majority's approach to the November 13 order is even more problematic. The majority says that to decide if § 1252(f)(1)'s injunction bar applies, we must first decide if the district court was right or wrong about its interpretation of § 1225. Concluding that the district court was right, the majority holds that the release of class members arrested under § 1357 may go forward. Ante at 19–22.

This sort of analysis—a court can enjoin the government on a class-wide basis so long as the government has the law wrong—has been squarely foreclosed by the Supreme Court. See *Aleman Gonzalez*, 596 U.S. at 552–54. The majority seems to suggest that, if the government is *wrong enough* about the law, a class-wide injunction is permissible under § 1252(f)(1). Ante at 19–22 & n.14. But such a rule has no grounding in the law. That the government's interpretation of § 1225 may be incorrect (we need not decide), does not authorize the court to go around § 1252(f)(1) and issue class-based relief. See *Aleman Gonzalez*, 596 U.S. at 552–54. I agree with the majority

(based on a straight-forward application of the agreement's remedial provision) that the district court lacked authority to order the blanket release of potential class members. But it is also the case that § 1252(f)(1) barred the November 13 order, even as to those arrested under § 1357 and regardless of whether the district court was right about the meaning of mandatory detention in § 1225. The district court issued class-wide injunctive relief enjoining § 1225. That's a violation of § 1252(f)(1).

II

As discussed above, the government is likely to succeed on the merits of its appeal for two reasons: first, because the district court failed to consider the unique nature of this litigation in modifying and enforcing the decree; second, because the orders run afoul of the INA's injunction bar. The remaining factors for a stay are also met. See *Nken v. Holder*, 556 U.S. 418, 426 (2009).

The government faces irreparable harm. See *Trump v. CASA, Inc.*, 606 U.S. 831, 860–61 (2025); *Noem v. Vasquez Perdomo*, No. 25A169, 2025 WL 2585637, at *3 (U.S. Sept. 8, 2025) (Kavanaugh, J., concurring) ("Any time that the Government is enjoined by a court from effectuating statues enacted by representatives of its people, it suffers a form of irreparable injury.") (citation modified). The majority argues that the government suffers no harm from being forced to comply with a consent decree that it voluntarily entered. Ante at 24–25. But the consent decree addressed § 1357. The government never agreed to follow a particular interpretation of §§ 1225 or 1226, and that's the harm in this case. These orders bar the government from enforcing those laws as the government believes it should. The fact that the government suffers that harm in the

context of a consent decree does not matter. This case is like
*CASA* because the government seeks to enforce its view of the
law and has been barred from doing so by a district judge. See
606 U.S. at 859. The balance of equities does not counsel
against awarding the government interim relief given the
overbreadth of the orders at issue. The motion for a stay pend-
ing appeal should be granted.