In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 25-3050

MARGARITO CASTAÑON-NAVA, *et al.*,

*Plaintiffs-Appellees*,

*v.*

U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,

*Defendants-Appellants*.

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:18-cv-3757 — **Jeffrey I. Cummings**, *Judge.*

———————————

ARGUED FEBRUARY 3, 2026 — DECIDED MAY 5, 2026

———————————

Before KIRSCH, LEE, and PRYOR, *Circuit Judges.*

LEE, *Circuit Judge.* In 2018, Plaintiffs filed this suit against
the Department of Homeland Security and the U.S. Immigra-
tion and Customs Enforcement ("Defendants"), alleging that
they violated 8 U.S.C. § 1357(a)(2) by arresting noncitizens
without reason to believe that they were likely to escape be-
fore warrants could be obtained. To resolve the lawsuit, in
2022, Defendants and Plaintiffs entered into a Consent Decree
that was negotiated over the course of two different

administrations. In it, Defendants agreed, among other things, to comply with § 1357(a)(2) when making warrantless arrests and issue a "Broadcast Statement of Policy" affirming "the underlying laws and policies applicable to all arrests effected under 8 U.S.C. § 1357(a)(2)." Dkt. 155-1 at 5, 6, 17.[1]

In exchange, Defendants obtained a dismissal with prejudice and release of all related claims, "avoid[ing] the substantial expense, inconvenience, and distraction of further protracted litigation ... and finally put[ting] to rest and terminat[ing]" the action. *Id.* at 2. Defendants do not challenge the validity of the original Consent Decree or the authority of the district court to enter it.

Instead, Defendants appeal two orders the district court entered on October 7, 2025, and November 13, 2025. As to the former, Defendants object to the district court's decision to extend the Consent Decree by 118 days due to Defendants' substantial noncompliance with its terms. As to the latter, Defendants take issue with the district court's order that they release 13 class members, as well as approximately 200 additional individuals, whose arrests (in the district court's words) "potentially" violated § 1357(a)(2).[2]

In December 2025, Defendants filed a motion to stay the orders pending appeal, which we denied in part and granted in part. *See Castañon-Nava v. U.S. Dep't of Homeland Sec.*, 161 F.4th 1048 (7th Cir. 2025). After the benefit of full briefing and

---

[1] "Dkt." refers to the docket number in the district court record.

[2] At oral argument on February 3, 2026, Plaintiffs' counsel represented that the number of potential class members is now "fewer than 200." Oral Argument at 21:29.

oral argument, we now affirm the October 7 order's 118-day extension of the Consent Decree and affirm in part and reverse in part the November 13 order.

## I. Background

In 2018, Plaintiffs filed this class action against the Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), and various federal officials, alleging that they were arresting noncitizens without a warrant in violation of 8 U.S.C. § 1357(a)(2). This provision provides, in relevant part:

> Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have power without warrant ... to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of [any law or regulation made in pursuance of law regulating the admission, exclusion, expulsion, or removal of aliens] and is likely to escape before a warrant can be obtained for his arrest.

After several years of discovery and motion practice, the parties negotiated a settlement and signed the Consent Decree on November 29, 2021. On February 8, 2022, the district court granted final approval of the agreement, entered the Consent Decree, and certified the following class pursuant to Federal Rule of Civil Procedure 23(e): "All current and future persons arrested without a warrant for a civil violation of U.S. immigration laws within the area of responsibility of the ICE Chicago Field Office." Dkt. 158 at 4.

As part of the Consent Decree, Defendants agreed to issue a "Broadcast Statement of Policy" to all ICE officers affirming

ICE's obligations under § 1357(a)(2). Dkt. 155-1 at 6–7, 17–19. Defendants also agreed to adopt or amend training materials to ensure compliance with § 1357(a)(2) and maintain records documenting warrantless arrests. *Id.* at 7–8.

The Consent Decree also laid out how the parties would address any future claims that Defendants had violated the terms of the Consent Decree. For example, in those instances where Plaintiffs believe that Defendants have arrested and detained an individual in violation of § 1357(a)(2), they can raise the issue with Defendants and file a motion to enforce if the parties are unable to agree upon a resolution. *Id.* at 10–11. Furthermore, if Plaintiffs come to believe that Defendants have repeatedly and materially violated the Consent Decree, they can file a motion, after conferring with Defendants, and seek appropriate equitable relief from the court. *Id.* at 11.[3]

Under its terms, the Consent Decree was scheduled to expire on May 12, 2025, three years after its effective date. However, the parties agreed that it would only terminate on that date "absent a pending motion to enforce its terms." *Id.* at 5.

---

[3] Release comports with the remedy provided when someone is arrested in violation of federal law. *See Arias v. Rogers*, 676 F.2d 1139, 1142 (7th Cir. 1982) ("If the petitioners had been arrested illegally by [immigration] officers and carted off to jail and the [agency] had made no move to begin deportation proceedings, the petitioners would have been entitled to obtain their freedom through a habeas corpus proceeding because their detention would have violated the Fourth Amendment, which forbids 'unreasonable ... seizures,' including arrests, of persons whether or not they are citizens; and the immigration laws, specifically 8 U.S.C. § 1357(a)(2).").

No. 25-3050                                                    5

## A. October 7 Order

On March 13, 2025, Plaintiffs filed a motion to enforce the Consent Decree, asserting that ICE had arrested 26 individuals in violation of § 1357(a)(2) and the Consent Decree. Dkt. 164.

On April 14, 2025, Plaintiffs also filed a motion to modify the Consent Decree pursuant to Rule 60(b)(5). Dkt. 177. In it, Plaintiffs argued that an extension of the Consent Decree by an additional three years was warranted given Defendants' repeated and material noncompliance with the Consent Decree.

While both motions were pending, a senior DHS official issued an email on June 11, 2025, unilaterally declaring that ICE's obligations under the Consent Decree were terminated:

> Despite a pending motion to enforce the settlement agreement and motion to extend the settlement agreement, it remains terminated. Accordingly, I hereby rescind the May 27, 2022, Castañon-Nava Settlement Obligation statement of policy.

Dkt. 193 at 1.

On October 7, 2025, the district court granted the enforcement motion in part, finding that 22 of the 26 individuals identified in the motion were arrested in violation of the Consent Decree. Because some of the 22 individuals were arrested pursuant to blank or field-issued I-200 warrants,[4] Defendants

---

[4] A Form I-200, which is entitled "Warrant of Arrest," is an administrative arrest warrant issued against noncitizens for civil immigration violations by an authorized immigration officer. *See* 8 C.F.R. § 236.1(b)(1)

argued that those arrests were not warrantless and, thus, fell outside the scope of the Consent Decree. The district court disagreed and, because the 22 individuals had already been released, entered an order awarding fees to Plaintiffs. Defendants do not challenge that relief here.

Instead, what they appeal is the remainder of the October 7 order granting Plaintiffs' Rule 60(b)(5) request to modify the Consent Decree by extending it. In short, the district court found that Defendants had failed to substantially comply with the Consent Decree. But it concluded that an extension of 118 days—not three years, as Plaintiffs requested—was the appropriate remedy. This extension, the court reasoned, was equal to the number of days between June 11, 2025—the date that Defendants announced they would stop abiding by the Consent Decree—and October 7, 2025, the date of the order's issuance. Thus, it ordered that the Consent Decree remain in effect until February 2, 2026. On appeal, Defendants challenge the 118-day extension.[5]

**B. November 13 Order**

Soon thereafter, on October 20, 2025, Plaintiffs filed a Motion for Placement of Potential Class Members on Alternatives to Detention ("ATD motion"). Dkt. 219. The ATD motion was

---

(regulation governing arrests with I-200 warrant); 8 U.S.C. § 1226 (statute governing arrest of noncitizens pursuant to warrant).

[5] Pursuant to its terms, the Consent Decree remains in effect because at least one additional motion to enforce remains pending. *See* Dkts. 372, 382. Furthermore, the parties agree that the district court retains jurisdiction to enforce the Consent Decree for thirty days following Defendants' certification that they have produced all required records, which has yet to occur. Dkt. 303 at 56–57.

filed in response to Defendants' request for a two-month extension to produce certain documents Plaintiffs had sought regarding the arrest of numerous individuals whom Plaintiffs believed had been arrested in violation of the Consent Decree. Given the delay, Plaintiffs asked the district court to order Defendants to place "each potential class member" arrested prior to October 7, 2025, on ankle monitors or other alternatives to detention. Dkt. 219-9 at 1. Defendants objected, arguing that release of these "potential" class members contravened the Consent Decree, which permitted release only when Plaintiffs established that the arrests in question violated § 1357(a)(2) and the Consent Decree. Dkt. 227.

On November 7, 2025, the parties filed a joint status report, identifying 46 arrests that the parties agreed violated the Consent Decree. At a hearing on November 12, 2025, the parties indicated that two additional individuals were no longer in detention and confirmed 13 class members had been arrested in violation of the Consent Decree and remained in ICE custody. Defendants nevertheless opposed their release, asserting for the first time that the 13 individuals, who were arrested without a warrant of any kind, were being detained pursuant to ICE's mandatory detention authority under 8 U.S.C. § 1225(b)(2)(A).

On November 13, 2025, the district court ordered the release of the 13 individuals. It also granted Plaintiffs' broader request, noting that "given the number of instances where the parties have agreed that the rights of the class members were violated, it stands to reason that a significant number of additional violations will be uncovered as plaintiffs receive and analyze the arrest records of the remaining arrestees." Dkt. 247 at 4. Accordingly, the district court also ordered

Defendants to release on bond, or other alternatives to deten-
tion, 615 "potential class members," who were detained but
did not pose a high risk of danger to the public.[6] According to
the parties, that number now stands at around 200. On appeal,
Defendants challenge the November 13 order in its entirety.

## II. Discussion

### A. The 118-Day Extension

We begin with Defendants' appeal of the district court's
decision in its October 7 order to extend the term of the Con-
sent Decree by 118 days.

As a preliminary matter, we conclude (and the parties
agree) that 28 U.S.C. § 1292(a)(1) grants us jurisdiction to re-
view the district court's ruling. *See Motorola, Inc. v. Comput.
Displays Int'l, Inc.*, 739 F.2d 1149, 1155 (7th Cir. 1984) (holding
that this court has jurisdiction to review orders regarding in-
junctions where the district court "alters the legal relationship
between the parties, whether by 'modification' or 'interpreta-
tion.'"). The parties also agree that the applicable standard of
review is abuse of discretion. *See Shakman v. Clerk of Cook
Cnty.*, 994 F.3d 832, 840 (7th Cir. 2021). Thus, we adopt the
district court's findings unless "clearly erroneous," *id.*, keep-
ing in mind that "[a]n error of law is necessarily an abuse of
discretion," *Tsareff v. ManWeb Servs., Inc.*, 794 F.3d 841, 848
(7th Cir. 2015) (citing *Est. of Enoch ex rel. Enoch v. Tienor*, 570
F.3d 821, 822 (7th Cir. 2009)).

Here, Defendants do not challenge the district court's fac-
tual findings justifying the 118-day extension. Instead, they

---

[6] This ruling was stayed pending appeal. *See Castañon-Nava*, 161 F.4th
at 1064.

contend that the 118-day extension constitutes an "error of law" because it contravenes 8 U.S.C. § 1252(f)(1) as well as "fundamental restrictions on the modification of 'institutional reform decrees.'" App. Br. at 26–27. We consider each argument in turn.

### 1. Section 1252(f)(1) Does Not Preclude Relief

Defendants contend that 8 U.S.C. § 1252(f)(1) bars the court from extending the Consent Decree. That statute provides:

> Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter [8 U.S.C. §§ 1221–1232], as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

In Defendants' view, the October 7 order violates § 1252(f)(1) because, by extending the Consent Decree, it impermissibly restrains the government's authority to detain noncitizens under 8 U.S.C. §§ 1225(b) and 1226(a).

#### a. Waiver

This is not the first time Defendants have raised this objection. In fact, they made this exact argument before the district court on at least two separate occasions before agreeing to the Consent Decree. *See* Dkt. 27 at 13–14 (opposition to class certification); Dkt. 66-1 at 14–15 n.5 (motion to dismiss). Then, to obtain the benefits of settlement, Defendants abandoned the

argument, thereby waiving it.[7] This is a textbook example of an "intentional relinquishment of a known right." *Miller v. Willow Creek Homes, Inc.*, 249 F.3d 629, 631 (7th Cir. 2001); *see United States v. Armour & Co.*, 402 U.S. 673, 681 (1971) ("Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms.").

In response, Defendants argue that a § 1252(f)(1) objection is unwaivable because it is jurisdictional. But, as the Supreme Court has held, although it uses the word "jurisdiction," § 1252(f)(1) does not limit a federal court's *subject matter* jurisdiction to hear the matter. *Biden v. Texas*, 597 U.S. 785, 797–801 (2022). The "question whether a court has jurisdiction to grant a particular remedy," the Supreme Court observed, "is different from the question whether it has subject matter jurisdiction over a particular class of claims." *Id.* at 801.

Resisting this conclusion, Defendants assert that "jurisdiction," as mentioned in § 1252(f)(1), "speaks to 'a court's power,' and so cannot 'be forfeited or waived,'" quoting *United States v. Cotton*, 535 U.S. 625, 630 (2002). But, even in *Cotton*, the Supreme Court was careful to point out that it was subject matter jurisdiction that could not be waived "because it involves a court's power to hear a case." *Id.* By contrast, nothing in § 1252(f)(1) restricts a federal court's power to adjudicate or hear a case. "By its plain terms, and even by its

---

[7] Defendants also failed to raise their § 1252(f)(1) argument in their opposition to Plaintiffs' Rule 60(b)(5) motion to modify, thereby waiving it a second time. *See Wheeler v. Hronopoulos*, 891 F.3d 1072, 1073 (7th Cir. 2018) ("Failing to bring an argument to the district court means that you waive that argument on appeal.") (citing *United Cent. Bank v. Davenport Est. LLC*, 815 F.3d 315, 318 (7th Cir. 2016), and *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012)).

title, section 1252(f)(1) is nothing more or less than a limit on *injunctive relief.*" *Biden v. Texas*, 597 U.S. at 801 (citation modified) (emphasis added).

And, while it is true that the Supreme Court did not expressly decide in *Biden v. Texas* whether § 1252(f)(1) is waivable, *id.* at 801 n.4, there is ample reason to believe that it is, given that objections to similar rules limiting the reach of a federal court's power are waivable, *see, e.g., Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999) (personal jurisdiction is waivable); *Hoffman v. Blaski*, 363 U.S. 335, 343 (1960) ("[V]enue, like jurisdiction over the person, may be waived."); *Pusey & Jones Co. v. Hanssen*, 261 U.S. 491, 500 (1923) (equitable jurisdiction defect is waivable); *Sossamon v. Texas*, 563 U.S. 277, 284 (2011) (state sovereign immunity is waivable).

Consider the rules governing equitable jurisdiction, perhaps the closest analogy, which limit a federal court's power to grant equitable relief. *See Schlesinger v. Councilman*, 420 U.S. 738, 753–54 (1975) ("There remains the question of equitable jurisdiction, a question concerned, not with whether the claim falls within the limited jurisdiction conferred on the federal courts, but with whether consistently with the principles governing equitable relief the court may exercise its remedial powers"); *Guaranty Trust Co. v. York*, 326 U.S. 99, 105–06 (1945) ("[A] plain, adequate and complete remedy at law must be wanting" for a federal court to exercise its equity powers); *Ruiz v. Bradford Exch, Ltd.*, 153 F.4th 907, 910 (9th Cir. 2025) ("The doctrine of 'equitable jurisdiction' places limits on the equitable powers of federal courts.").

Defendants concede that defects in equitable jurisdiction are waivable. *See Pusey & Jones Co.*, 261 U.S. at 500 ("[U]nlike lack of jurisdiction as a federal court ... lack of equity

jurisdiction (if not objected to by a defendant) may be ignored by the court, [in certain cases]. And where the defendant has expressly consented to action by the court, or has failed to object seasonably, the objection will be treated as waived."); *Am. Mills Co. v. Am. Sur. Co. of N.Y.*, 260 U.S. 360, 363 (1922) (finding that the defendant had waived its adequate-remedy-at-law objection).

In much the same way, § 1252(f)(1) limits a court's power to grant equitable relief (here, in the form of a classwide injunction) under certain conditions. Accordingly, as in the case of equitable jurisdiction, we conclude that any objection based on § 1252(f)(1) is waivable, and Defendants did so here.

### b. The order does not contravene § 1252(f)(1)

That said, even assuming that objections invoking § 1252(f)(1) cannot be waived, the 118-day extension of the Consent Decree does not violate § 1252(f)(1) when it comes to warrantless arrests. Recall that § 1252(f)(1) only applies to classwide injunctive relief that "enjoin[s] or restrain[s] the operation of" certain provisions, namely, 8 U.S.C. §§ 1221 through 1232. The Consent Decree, on the other hand, focuses squarely on § 1357(a)(2) and requires Defendants' compliance with it (and no other statute) when making warrantless arrests. Because § 1357(a)(2) is not a covered provision, the extension of the Consent Decree does not implicate § 1252(f)(1).

Defendants insist that the Consent Decree nonetheless violates § 1252(f)(1) because it "require[s] the Government to use its authority under § 1226(a) to 'arrest' aliens '[o]n a warrant'—at least for any alien whose likelihood of escape cannot be immediately ascertained and documented." App. Br. at 41. In essence, Defendants complain that, because the Consent

Decree does not allow them to arrest individuals in violation of § 1357(a)(2), it requires them to find that authority elsewhere. But "[u]nder our system even government must operate within the law." *Yanish v. Barber*, 73 S. Ct. 1105, 1108 (1953). And, if requiring the government to comply with § 1357(a)(2) prompts ICE to rely more on I-200 warrants issued under § 1226(a), such indirect, collateral effects do not run afoul of § 1252(f)(1). *See Garland v. Aleman Gonzalez*, 596 U.S. 543, 553 n.4 (2022) (observing that "a court may enjoin the unlawful operation of a provision *that is not specified in § 1252(f)(1)* even if that injunction has some collateral effect on the operation of a covered provision") (emphasis in original); *Texas v. U.S. Dep't of Homeland Sec.*, 123 F.4th 186, 209–11 (5th Cir. 2024) (§ 1252(f)(1) does not prohibit injunctive relief to remedy violations of § 1357(a)(3) even if it may have a collateral effect on the government's operations under § 1225 and § 1226); *Al Otro Lado v. Exec. Office for Immigr. Rev.*, 138 F.4th 1102, 1124 (9th Cir. 2025), *cert. granted on other grounds sub nom. Noem v. Al Otro Lado*, No. 25-5, —— U.S. ——, 2025 WL 3198572 (U.S. Nov. 17, 2025) ("Our court has repeatedly held that § 1252(f)(1) does not prohibit an injunction simply because of collateral effects on a covered provision."); *Gonzalez v. U.S. Immigr. & Customs Enf't*, 975 F.3d 788, 812–15 (9th Cir. 2020) (Section 1252(f)(1) does not apply to classwide relief grounded in § 1357(d) because it "is not located in Part IV, and thus § 1252(f)(1)'s limitations do not apply.").

To press their case, Defendants rely on *N.S. v. Dixon*, 141 F.4th 279 (D.C. Cir. 2025), but that case is distinguishable. There, the district court had concluded that the U.S. Marshals lacked authority to make civil immigration arrests pursuant to I-200 warrants. It then permanently enjoined the Marshals "from arresting and detaining criminal defendants in the

Superior Court for the District of Columbia for suspected civil immigration violations." *Id.* at 284. The D.C. Circuit agreed that the Marshals lacked the authority to arrest but reversed the injunction, reasoning that "[a]n injunction that restrains the Government from carrying out an arrest and detention of a criminal defendant pursuant to an I-200 form clearly affects provisions to which § 1252(f)(1) applies." *Id.* at 289. Unlike *N.S.*, the Consent Decree only addresses warrantless arrests made pursuant to § 1357(a)(2).

Accordingly, even if Defendants had not waived their objections under § 1252(f)(1), we hold that the provision does not bar classwide equitable relief for those arrested without a warrant under § 1357(a)(2).

As Defendants note, however, the district court's order went beyond this. It found (and Defendants do not dispute) that ICE had implemented a policy of issuing defective I-200 warrants in the field to avoid its obligations under § 1357(a)(2) and the Consent Decree.[8] But, as the Supreme Court held in *Aleman Gonzalez*, § 1252(f)(1) bars an inferior court from issuing classwide injunctive relief that would interfere with ICE's operation of § 1226, even if the court believes the manner in which the government exercised its authority under the provision (here, via the use of deficient I-200 warrants) is

---

[8] The district court referenced, among other things, an ICE Academy training presentation which stated, "Officers may also carry a blank form I-200 for the arrest of each collateral so that an individual flight risk analysis is not needed." Dkt. 185-2 at 4.

unlawful. 596 U.S. at 550–51.[9] Thus, this portion of the district court's reasoning was erroneous, and the Consent Decree does not cover those arrested pursuant to a warrant, defective or otherwise.

### c. The district court did not abuse its discretion

Despite this shortcoming, given the numerous other systemic violations the district court found, we cannot conclude on this record that the court abused its discretion when partially granting Plaintiffs' request under Rule 60(b) to extend the Consent Decree as applied to warrantless arrests.

When seeking to modify a consent decree under Rule 60(b)(5), the movant bears the burden to establish that a significant change in circumstances warrants revision. *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 383 (1992). Such a change in circumstances may occur where the defendant has failed to substantially comply with the terms of the decree. *See Kelly v. Wengler*, 822 F.3d 1085, 1098 (9th Cir. 2016) ("Under well established law, substantial violation of a court order constitutes a significant change in factual circumstances."). If the movant makes that showing, we consider "whether the proposed modification is suitably tailored to the changed circumstance." *Rufo*, 502 U.S. at 383.

---

[9] Plaintiffs' argument that the relief granted by the Consent Decree is individualized (although in the context of a class action) also is foreclosed by *Aleman Gonzalez*. *See* 596 U.S. at 554 ("But § 1252(f)(1) refers to 'an individual,' not 'individuals.'"). That said, an individual arrested pursuant to a field-issued I-200 warrant can still challenge the validity of the warrant in federal court on an individual basis (for example, in a habeas proceeding), but he cannot do so as part of a class action.

Here, even putting aside the deficient I-200 warrants, the district court cited multiple instances where Defendants had failed to comply with the Consent Decree while making warrantless arrests. It also relied on the unilateral proclamation by a DHS senior official on June 11, 2025, that DHS would no longer comply with the Consent Decree. Although Defendants argue that the district court's "primary justification" for the extension was the policy of arresting noncitizens with defective I-200 warrants, the record does not bear this out.

All told, on this record, we cannot say that the district court abused its discretion when finding that Defendants failed to substantially comply with their obligations under the Consent Decree. Nor did it act irrationally when finding that such violations constituted a significant change in circumstances that warranted a modification of the Consent Decree under Rule 60(b)(5). *See Siddiqui v. Nat'l Ass'n of Broad. Emps. & Technicians*, 132 F.4th 530, 532 (7th Cir. 2025) ("A district court abuses its discretion 'if it reaches an erroneous conclusion of law ... or reaches a conclusion that no evidence in the record supports as rational.'") (quoting *In re Stericycle Sec. Litig.*, 35 F.4th 555, 559 (7th Cir. 2022)); *see also United States v. Carlberg*, 108 F.4th 925, 930 (7th Cir. 2024) ("We will find an abuse of discretion if there is no evidence in the record on which the district court could have rationally based its decision.") (citation omitted).

Furthermore, the district court's modification was reasonable and narrowly tailored to address Defendants' noncompliance. In fact, the district court rejected Plaintiffs' request for a three-year extension and instead extended the Consent Decree by only 118 days, the period between June 11, 2025 (the

date of the DHS email) and October 7, 2025 (the date of the order's issuance).

### 2. Defendants' Invocation of *Horne* and *Evans*

No doubt prompted by our colleague's prior dissent, Defendants argue in the alternative that the 118-day extension "transgresses fundamental limits on a court's authority to modify a consent decree … entered into by former government officials." App. Br. at 38–41; Reply Br. at 15–16. Modifying the Consent Decree in this manner, they posit, disrupts core principles of separation-of-powers and self-governance, presumably because the Consent Decree was negotiated over the course of two prior administrations (although, notably, this included President Trump's first term). And, for support, they cite *Horne v. Flores*, 557 U.S. 433, 450 (2009), and *Evans v. City of Chicago*, 10 F.3d 474, 478 (7th Cir. 1993). But this argument fails for two principal reasons.

First, like their § 1252(f)(1) argument, Defendants failed to raise this objection below (indeed, they did not mention it in their prior appellate briefs either). And it is hornbook law that a party who does not alert the district court to an issue waives it for the purposes of appeal. *See Williams v. Dieball*, 724 F.3d 957, 961 (7th Cir. 2013) ("[A] party who fails to adequately present an issue to the district court has waived the issue for purposes of appeal.") (citation omitted).[10]

---

[10] The dissenting opinion would impose upon the district court the obligation to engage in such an analysis *sua sponte*. But "[i]n our adversarial system of adjudication, we follow the principle of party presentation," where the parties "'frame the issues for decision,' while the court serves as 'neutral arbiter of matters the parties present.'" *Clark v. Sweeney*, 607

Second, one could perhaps imagine dystopian scenarios where binding political officials to consent decrees negotiated by their predecessors could lead to abuse (although, as we have noted before in our prior opinion, a rule that a consent decree or settlement agreement can *never* bind future officials raises its own thorny issue), but both *Horne* and *Evans* recognize at least two mechanisms that would ameliorate the risk of such abuse, both of which apply here.

The first mechanism is Rule 60(b)(5). As the Supreme Court observed in *Horne*, that rule allows a governmental party to seek modification of a consent decree when "applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5); *see Horne*, 557 U.S. at 452 ("And precisely because federalism concerns are heightened, a flexible approach to Rule 60(b)(5) relief is critical."). Indeed, that is precisely what the state entities did in *Horne*. *See* 557 U.S. at 439 (noting that the school district filed a motion under Rule 60(b)(5) "on the ground that enforcement of a judgment is 'no longer equitable'").

Had Defendants similarly invoked Rule 60(b)(5) and asked the district court to amend the Consent Decree based on the government's new policy initiatives, the district court would have had the chance to address them and may have

---

U.S. 7, 9 (2025) (per curiam); *see United States v. Page*, 123 F.4th 851, 865 (7th Cir. 2024) (en banc) ("Courts therefore "do not, or should not, sally forth each day looking for wrongs to right. They wait for cases to come to them, and when cases arise, courts normally decide only questions presented by the parties.") (quoting *United States v. Sineneng-Smith*, 590 U.S. 371, 376 (2020)).

fashioned a different approach. But Defendants did not avail themselves of that opportunity here.[11]

The second mechanism to safeguard separation-of-power and self-governance principles is to ensure that any enforcement of a consent decree is grounded "on the existence of a substantial claim under federal law." *Evans*, 10 F.3d at 480; *see Horne*, 557 U.S. at 450. Here, the Consent Decree is squarely focused on requiring Defendants' compliance with § 1357(a)(2), and Plaintiffs' request to extend the Consent Decree flows directly from Defendants' failure to carry out this obligation.

Tellingly, Defendants do not challenge the validity of the Consent Decree or the authority of the district court to enter it. Instead, Defendants argue that the district court improperly expanded the scope of the Consent Decree to restrict the government's operation under § 1226. But, properly understood, the Consent Decree covers only those individuals who were arrested without a warrant of any kind (I-200 or otherwise). And, to the extent that the district court relied on the government's unlawful use of I-200 warrants as a basis for the extension order, this was error for the reasons discussed. That said, the court's other justifications were sufficient to support

---

[11] According to Defendants, they had no reason to file a motion to modify under Rule 60(b)(5) because "the Decree expired on its own terms no later than October 7." App. Br. at 40. But this argument contradicts the plain terms of the Consent Decree, which provides that the decree does not expire if there was a "pending motion to enforce its terms." Dkt. 155-1 at 4. Plaintiffs' enforcement motion was pending for over six months, during which time Defendants had every chance to file a Rule 60(b)(5) motion to raise its concerns and seek appropriate relief.

its decision under the deferential abuse of discretion stand-ard.

* * *

For these reasons, we find that the district court did not abuse its discretion when ordering that the Consent Decree be extended by 118 days based upon its findings of substantial noncompliance.

## B. November 13 Order

In its November 13 order, the district court required the release of 13 individuals whom the parties agreed were ar-rested in violation of the Consent Decree. It also granted Plaintiffs' ATD motion and mandated the release of hundreds of "potential class members" (to use the district court's words) so long as Defendants have not designated them to be high public-safety risks.

On appeal, Defendants contend that this order violates § 1252(f)(1) by restricting the government's ability to detain noncitizens pursuant to its authority under § 1225(b)(2)(A) and § 1226(a). Furthermore, in their view, the order contra-venes the terms of the Consent Decree itself in two ways. First, Section IV(E)(3)(a) of the Consent Decree precludes the re-lease "Class Members subject to mandatory detention pursu-ant to the [INA]," and here, Defendants argue, the individuals in question are being detained pursuant to DHS's mandatory detention authority under § 1225(b)(2)(A). Second, Defend-ants contend that, to the extent the district court is permitted to release detained individuals under the Consent Decree at all, it can only do so after "a determination by the Parties or the Court ... that [the] Class Member was so arrested contrary

to the terms of the Agreement," Dkt. 155-1 at 8.[12] We review such issues of law *de novo*. *See Holmes v. Godinez*, 991 F.3d 775, 780 (7th Cir. 2021).

### 1. § 1225(b)(2)(A) and § 1226(a)

Defendants first contend that the November 13 order is barred by § 1252(f)(1). As to those noncitizens who were arrested with defective I-200 warrants, Defendants argue that the order impermissibly infringes upon their operations under § 1226 in contravention of § 1252(f)(1) and *Aleman Gonzalez.* We believe the government is correct on this score for the reasons already explained.

As for those individuals who were arrested without any warrant whatsoever, Defendants insist that the release order still violates § 1252(f)(1) because the government is detaining those individuals pursuant to its mandatory detention authority set forth in § 1225(b)(2)(A).

As an initial matter, for the reasons discussed above with respect to Defendants' challenge to the October order, there is a strong argument that Defendants waived this argument as well when they agreed to the Consent Decree to resolve the underlying litigation (although they did raise it prior to the

---

[12] Plaintiffs dispute our jurisdiction to review Defendants' challenges to the November 13 order. But we have jurisdiction to review the November 13 order under 28 U.S.C. § 1292(a)(1), which confers appellate jurisdiction over injunctions, including post-judgment orders that functionally act as injunctions when they "substantially and obviously alter the parties' pre-existing legal relationship." *Jones-El v. Berge*, 374 F.3d 541, 543–44 (7th Cir. 2004) (citation omitted). The district court's order requiring the release of hundreds of potential class members satisfies this condition.

entry of the November 13 order). But the argument fails on the merits too.

Before getting there, however, my colleagues, citing *Aleman Gonzalez*, 596 U.S. 543, believe that we should not reach this issue because § 1252(f)(1) proscribes our ability in this case to assess whether § 1225(2)(A) applies in the first instance. But this, I believe, overreads both the text of § 1252(f)(1) and the Supreme Court's holding in *Aleman Gonzalez*.

Recall that § 1252(f)(1) applies to classwide injunctive relief that "enjoin[s] or restrain[s] *the operation of*" the enumerated provisions. 8 U.S.C. § 1252(f)(1) (emphasis added). And *Aleman Gonzalez* explained that the "'operation of' (a thing) means the functioning of or working of (that thing.)" 596 U.S. at 549. "Accordingly, the 'operation of' the relevant statutes is best understood to refer to the Government's efforts to enforce or implement them." *Id.* at 550. Later, in response to the petitioners' contention that "operation of" a covered statute means the lawful operation of it, the Court rejected this argument and gave a host of linguistic examples from prior cases to make its point, including the "unlawful operation of a car," "improper operation" of "drainage ditches," "unlawful operation of a railway," and "unlawful operation of video poker machines." *See id.* at 552.

In my view, the Supreme Court's focus on the phrase "operation of," as well as its definition and illustrations, indicate that § 1252(f)(1)'s bar of classwide injunctive relief applies to the manner in which the government chooses to enforce or implement its authority under the covered provisions, not whether the provisions apply in the first instance. To use the Court's illustrations, § 1252(f)(1) prohibits a lower court's

ability to dictate *how* a defendant operates a car, a drainage ditch, a railway, or video poker machines, not whether "the thing" operated is in fact a car, drainage ditch, railway, or video poker machine. This distinction respects Congress's intent to grant the government wide discretion in its operations of the covered provisions while preserving "the province and duty of the judicial department to say what the law is." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385 (2024) (quoting *Marbury v. Madison*, 5 U.S. 137, 177 (1803)). Defendants cannot insulate themselves by merely arguing *ipse dixit* that § 1225 applies. *See Texas v. DHS*, 123 F.4th at 210 (noting that, despite DHS's contention that a wire barrier would impede its ability to detain noncitizens pursuant to its authority under §§ 1225 and 1226, the federal agency defendants were not "the ultimate judges of whether § 1252(f)(1)'s bar applies").[13]

Indeed, the facts in *Aleman Gonzalez* support this more nuanced reading. There, the petitioners, who were detained under 8 U.S.C. § 1231(a)(6), were not challenging the applicability of that section; instead, they objected to the government's failure to provide them with a bond hearing in its implementation of § 1231(a)(6). *See Aleman Gonzalez*, 596 U.S. at 547 (petitioners claimed "that aliens detained under § 1231(a)(6) are entitled to bond hearings after six months' detention"). Similarly, in *N.S. v. Dixon* (the other case on which DHS relies), the

---

[13] Tellingly, Defendants do not point to anything in the record to support their contention that the individuals in question were in fact arrested and detained pursuant to § 1225(b)(2)(A) at the time of their arrests. *Id.* at 210–11 (rejecting DHS's reliance on § 1252(f)(1) when the factual record did not support it). They only now argue that it was so.

plaintiffs were not challenging the applicability of § 1226, rather they objected to the government's use of the U.S. Marshals to effectuate civil immigration arrests under § 1226. By contrast, here, the plaintiffs are not challenging the manner in which DHS is enforcing or implementing § 1225, they dispute the applicability of the section at all. Thus, in light of its text and *Aleman Gonzalez*, I do not believe that § 1256(f)(1)'s bar on classwide injunctive relief reaches the type of facial challenge the plaintiffs bring here.[14] With that, I turn to the dispute at hand.

The central question is whether § 1225(b)(2)(A) applies to noncitizens who are unlawfully within the United States as well as those who present themselves at its borders and ports of entry.[15] A host of courts have answered in the negative. *See*

---

[14] The dissenting opinion believes that barring the district court from impeding DHS's use of I-200 in its October order is inconsistent with countenancing the plaintiffs' challenge to the applicability of § 1225 in the context of the November order. This is not so. The October order rejected the manner in which the government was operating its authority under § 1226 (*i.e.,* by using faulty I-200 warrants); this falls squarely within the language of § 1252(f)(1). By contrast, the present question is whether § 1225 applies here at all.

[15] Answering this question will resolve DHS's general contention that it has the authority to detain Class Members pursuant to its mandatory detention authority under § 1225(b)(2)(A) as well as its alternative argument that such mandatory detention places these individuals outside the scope of the Consent Decree under Section IV(E)(3)(a). On the other hand, Judge Pryor believes that we need not reach this question because, as explained in her concurrence, Defendants waived any objection under § 1252(f)(1), and the parties upon entering the Consent Decree did not intend Section IV(E)(3) to encompass mandatory detention under § 1225(b)(2)—something neither side contemplated until DHS announced its new interpretation of § 1225(b)(2) on July 10, 2025.

No. 25-3050                                                        25

*Barco Mercado v. Francis*, 2025 WL 3295903, at *4, app. A (S.D.N.Y. Nov. 26, 2025) (collecting 350 cases). This reflects the Supreme Court's view that § 1225(b) "applies primarily to aliens seeking entry into the United States" while § 1226(a) is the "default rule" for the discretionary detention of noncitizens "already present in the United States," *Jennings v. Rodriguez*, 583 U.S. 281, 297, 303 (2018); *see also Nielsen v. Preap*, 586 U.S. 392, 396–97 (2019) (noting that § 1226(a) sets out "the general rule" regarding the "arrest and detention" of "aliens present in this country" pending a decision on removal). And it accords with the longstanding distinction in immigration law "between those aliens who have come to our shores seeking admission ... and those who are within the United States after an entry, irrespective of its legality." *Leng May Ma v. Barber*, 357 U.S. 185, 187 (1958); *see Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("The distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law.").

Nevertheless, Defendants insist that the text of § 1225(b)(2)(A) subjects to mandatory detention those noncitizens unlawfully present within the United States as well as those who arrive at its borders. This construction has found recent purchase in the Fifth and Eighth Circuits. *See Buenrostro-Mendez v. Bondi*, 166 F.4th 494 (5th Cir. 2026); *Avila v. Bondi*, 170 F.4th 1128 (8th Cir. 2025).[16]

---

[16] The Second Circuit just issued its decision in *Cunha v. Freden*, No. 25-3141-pr, — F.4th —, 2026 WL 1146044 (2d Cir. Apr. 28, 2026), disagreeing with the Fifth and Eighth Circuits and holding that § 1225(b)(2)(A) does not authorize the mandatory detention of noncitizens unlawfully residing in the United States. For the reasons explained, I agree.

Defendants' interpretation, however, not only fails to take full account of the statutory language but ignores the relevant statutory context and background as well as the government's own contemporaneous and decades-long understanding of the statute's meaning. By contrast, reading § 1225(b)(2)(A) to apply only to unadmitted noncitizens seeking lawful entry at our country's border and ports of entry faithfully adheres to each word in the statute, its grammatical structure, and statutory context, while accurately reflecting the statute's historical background, consistent with the government's long-standing understanding and application of it.

### a. The Statutory Language

"As always, we start with the text." *Campos-Chavez v. Garland*, 602 U.S. 447, 457 (2024) (citing *Bartenwerfer v. Buckley*, 598 U.S. 69, 74 (2023)). Section 1225(b)(2)(A), which was enacted as part of The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), provides:

> Subject to subparagraphs (B) and (C), in the case of an alien who is an *applicant for admission*, if the examining immigration officer determines that an alien *seeking admission* is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title.

8 U.S.C. § 1225(b)(2)(A) (emphases added).

According to Defendants, an "alien who is an applicant for admission" is necessarily an "alien seeking admission" and, thus, subject to mandatory detention. Plaintiffs, on the other hand, believe that "applicants for admission" may be—but are not necessarily—"alien[s] seeking admission." Therefore,

in their view, § 1225(b)(2)(A) applies only to those "applicants for admission" who are also presently "seeking admission."

Fortunately, the Act provides some useful clues. It defines "alien" as "any person not a citizen or national of the United States." 8 U.S.C. § 1101(a)(3). And the phrase "applicant for admission" is specifically defined as "[a]n alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters)." 8 U.S.C. § 1225(a)(1). Furthermore, "admission" and "admitted" means "the lawful entry of the alien into the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A).

Based on this, an "applicant for admission" is (1) a noncitizen who is already in the United States but who has not effectuated lawful entry into the country after inspection and authorization by an immigration officer, or (2) a noncitizen who arrives at its borders or ports of entry. "Applicant for admission," thus, is a status-based definition; it identifies a person by his characteristics (*i.e.*, unlawful presence in the country or presence at the border).

By contrast, consider the phrase "alien seeking admission." Although the Act defines "admission," it does not define "seeking," and when a statute does not define a word or phrase "in a specialized way" nor "employ a term of art with long-encrusted connotations in a given field," we "rely on its ordinary meaning," *Feliciano v. Dep't of Transp.*, 605 U.S. 38, 45 (2025), "at the time Congress enacted the statute," *New Prime Inc. v. Oliveira*, 586 U.S. 105, 113 (2019) (citation modified).

At the time of the IIRIRA's passage, prominent dictionaries defined the verb "to seek" to mean: "to resort to"; "to go to"; "to go in search of"; "look for"; "acquire or gain"; "aim at"; "to make an attempt," Merriam-Webster's Collegiate Dictionary (10th ed. 1994); "to go in search or quest of"; "to try to find or discover by searching or questioning"; "to try to obtain"; to try or attempt"; "to go to"; "to ask for"; "request"; "to search or explore"; "to make an inquiry," Random House Webster's Unabridged Dictionary (2d ed. 1997).[17]

More to the point, when interpreting a statute, grammatical usage is a useful guide. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 141 (2012) ("Grammatical usage is one of the means … by which the sense of a statute is conveyed."). In § 1225(b)(2)(A), Congress elected to use the present participle form of "seek" ("seeking"), which typically denotes present action. *See Present Participle*, Merriam-Webster's Collegiate Dictionary (10th ed. 1994) (defining a present participle as "a participle that typically expresses present action in relation to the time expressed by the finite verb in its clause and that in English is formed with the suffix *-ing* and is used in the formation of the progressive tenses"). Thus, "seeking admission" denotes "an affirmative, present-oriented" action. *See, e.g., Aroca v. Mason*,

---

[17] The Supreme Court has relied on versions of both Merriam Webster's Collegiate Dictionary and Random House Webster's Unabridged Dictionary in interpreting other provisions of the Act. *See Nielsen*, 586 U.S. at 408 (using Merriam-Webster's Collegiate Dictionary to define terms in 8 U.S.C. § 1226); *Scialabba v. Cuellar de Osorio*, 573 U.S. 41, 58 (2014) (using Random House Webster's Unabridged Dictionary to define terms in 8 U.S.C. § 1553).

No. 2:26-cv-57, 2026 WL 357872, at *13 (S.D. W. Va. Feb. 9, 2026); *see also* 8 C.F.R. § 235.1(f)(1) (as applied to "applicants for admission," those "seeking admission at a United States port-of-entry must present whatever documents are required").

This is not pedantic hairsplitting. Congress's use of the present participle can also be seen in a neighboring provision, § 1225(a)(4). It states:

> An alien *applying* for admission may, in the discretion of the Attorney General and at any time, be permitted to withdraw the application for admission and depart immediately from the United States.

8 U.S.C. § 1225(a)(4) (emphasis added).

This section ably demonstrates that Congress's usage of grammar is intentional. Congress employs the present participle form of a verb when it wants to denote an affirmative action (here, the affirmative act of applying); otherwise, there would be no application for the noncitizen to withdraw.[18]

Contrary to Defendants' contention, then, an "applicant for admission" as defined by Congress is not the same as an noncitizen who is "seeking admission." This stands to reason. A noncitizen can be unlawfully present in the United States (*i.e.*, an "applicant for admission") without presently seeking lawful admission. And, conversely, a noncitizen can "seek" to

---

[18] It also reveals the fallacy of Defendants' argument because, under their proffered construction, all aliens who are "applicants for admission" would qualify as aliens "applying for admission" under § 1225(a)(4) even if they submit no application at all. This would render § 1225(a)(4) nonsensical.

be admitted into the United States without being an "applicant for admission" (say, a lawful permanent resident returning to the United States after a trip to her native country). *See Romero v. Hyde*, 795 F. Supp. 3d 271, 283 (D. Mass. 2025). The two phrases have distinct meanings.

Defendants, as well as the *Buenrostro-Mendez* and *Avila* courts, however, see things differently. Relying heavily on the "everyday meaning" of "applicant," they submit the two phrases must mean the same thing because "[w]hen a person applies for something, they are necessarily seeking it." *Buenrostro-Mendez*, 166 F.4th at 502; *see id.* at 503 (rejecting significance of the grammatical form of "seeking" as it appears in § 1225(b)(2)(A) on the grounds that "being an applicant ordinarily entails seeking something, it seems natural to use the words somewhat interchangeably"); *Avila*, 170 F.4th at 1134 (agreeing with the *Buenrostro-Mendez* court that the "ordinary meanings of the phrases 'applicant for admission' and 'seeking admission' are the same.").

While this reliance on everyday meaning has some superficial appeal, it is Congress's prerogative to define the phrase "applicant for admission" as it wishes, and it is Congress's definition, not one of our own design, that controls. As the Supreme Court reminds us, "When a statute includes an explicit definition, we must follow that definition, even if it varies from that term's ordinary meaning." *Stenberg v. Carhart*, 530 U.S. 914, 942 (2000) (citations omitted). Put another way, if Congress wanted to include noncitizens who are "seeking admission" within the definition of "applicant for admission" it could easily have done so, but "a definition which declares what a term 'means' excludes any meaning that is not stated." *Id.* (citation modified).

What is more, Defendants' reading—that all applicants for admission are necessarily seeking admission—would render certain words in § 1225(b)(2)(A) surplusage. *See Bufkin v. Collins*, 604 U.S. 369, 386 (2025) ("We are reluctant to treat statutory terms as surplusage in any setting.") (quoting *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001)). Indeed, if Congress had intended Defendants' interpretation, § 1225(b)(2)(A) would simply read:

> Subject to paragraphs (B) and (C), in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien ~~seeking admission~~ is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title.

By contrast, reading § 1225(b)(2)(A) to apply to only those "applicants for admission" who are actively "seeking admission" allows the two phrases to do independent work.[19]

Thus, § 1225(b)(2)(A)'s text leads to the conclusion that the provision applies not to all "applicants for admission" *en masse* but only to those "applicants for admission" who are actively "seeking" lawful admission. Here, there is no evidence that the class members, who were subject to warrantless arrest, were doing so. Therefore, on this record, their

---

[19] Conceding this surplusage, Defendants argue that redundancy is unavoidable under either construction. But this is incorrect. Under Plaintiffs' construction, both "applicant for admission" and "seeking admission" have independent roles. Section 1225(b)(2)(A) applies to "applicants for admission" but only those who are "seeking admission."

detention cannot be justified by § 1225(b)(2)(A) as Defendants claim.

But that is not all. The remaining text of § 1225(b)(2)(A) creates substantial doubt that the provision applies to noncitizens, who are within the country, at all. The statute goes on to state that an alien seeking admission is subject to detention "if the *examining immigration officer* determines that [he] is not clearly and beyond a doubt entitled to be admitted." 8 U.S.C. § 1225(b)(2)(A) (emphasis added). In immigration law parlance, "examination" has a particularized meaning typically indicating a process that a person undergoes when attempting to enter the country at the border or port of entry. *See* 8 C.F.R. § 235.1 (Entitled "Scope of Examination," the regulation states that "[a]pplication to lawfully enter the United States shall be made in person to an immigration officer at a U.S. port-of-entry" and, among other things, "[a] person claiming U.S. citizenship must establish that fact to the examining officer's satisfaction"); *United States v. Corrales-Vazquez*, 931 F.3d 944, 948 (9th Cir. 2019) (noting that "examination or inspection by immigration officers—occur, as they always have, at designated ports of entry that are staffed by immigration officials and open for inspection") (citation modified); *Romero*, 795 F. Supp. 3d at 283 ("examination" is "the specific legal process one undergoes while trying to enter the country"). As such, reading § 1225(b)(2)(A) in its entirety indicates that the mandatory detention it authorizes is directed at arriving noncitizens, not those who are already here.

Section 1101(a)(13)'s definition of "admission"—"the lawful entry of the alien into the United States after inspection and authorization by an immigration officer"—further supports this construction. Like examinations, inspections are

processes that ordinarily occur at the border. As one circuit court has observed, "this definition refers expressly to *entry into* the United States, denoting by its plain terms passage into the country from abroad at a port of entry." *Posos-Sanchez v. Garland*, 3 F.4th 1176, 1182–83 (9th Cir. 2021) (citation modified) (emphasis in original).

For these reasons, reading § 1225(b)(2)(A) to apply only to arriving noncitizens presently seeking admission into the United States takes full account of the provision's text and grammar and respects Congress's authority to define statutory terms as it sees fit.

### b. The Statutory Context

Section 1225(b)(2)(A)'s context also confirms that it is directed at noncitizens who are "seeking admission" at the border and ports of entry, not those already within the United States. *See Yates v. United States*, 574 U.S. 528, 537 (2015) (explaining that "statutory language is determined not only by reference to the language itself, but as well by the specific context in which that language is used, and the broader context of the statute as a whole") (citation modified); *see also Sturgeon v. Frost*, 577 U.S. 424, 438 (2016) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.") (quoting *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012)).

Consider § 1225's title and headings. *See Dubin v. United States*, 599 U.S. 110, 120–21 (2023) (The Supreme Court "has long considered that the title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute.") (citation modified). Section 1225's

title references "Inspection by immigration officers" (which, as we have seen, typically refers to a procedure that takes place when a person presents himself at the border or port of entry) as well as the "expedited removal of inadmissible arriving aliens." 8 U.S.C. § 1225. In fact, the term "inspection" appears throughout the section. *See*, *e.g.*, *id.* §§ 1225(a), (a)(3), (b), (b)(1), (b)(2), and (d). In this way, § 1225 lays out the process and standards immigration officials must employ when assessing noncitizens who seek lawful entry into the United States at its borders or ports of entry.

Furthermore, § 1225 is rife with other examples that illustrate its border-oriented focus. Such provisions include § 1225(a)(2) (stowaways); § 1225(c) (removal of "arriving" noncitizens inadmissible for certain security-related reasons); and § 1225(d) (the inspection of vessels and aircraft bringing noncitizens "into the United States"). This is also true of § 1225(b)(2) itself. *See id.* §§ 1225(b)(2)(B) (exempting crewmen and stowaways); 1225(b)(2)(C) (addressing noncitizens arriving "from a foreign territory contiguous to the United States").

We can also look to "neighboring statutory provision[s]," which "lend[] further contextual support for the view that" § 1225(b)(2)(A) is focused on arrivals at the border. *Pereira v. Sessions*, 585 U.S. 198, 210 (2018). For instance, § 1223 concerns the authority to contract with transportation lines for "inspection and admission of [noncitizens] coming to the United States from foreign territory or from adjacent islands" and the creation of "landing stations" at "points of entry." Section 1224 designates "ports of entry for [noncitizens] arriving by aircraft." And § 1225a involves the "preinspection" of noncitizens at foreign airports. They all lend weight to the

conclusion that § 1225(b)(2)(A) pertains to arriving nonciti-
zens.

Defendants too appeal to a neighboring provision,
§ 1225(a)(3), but its text cannot bear the weight of their argu-
ment. That section provides that "[a]ll aliens (including alien
crewmen) who are applicants for admission *or otherwise* seek-
ing admission or readmission to or transit through the United
States shall be inspected by immigration officers." 8 U.S.C.
§ 1225(a)(3) (emphasis added). According to Defendants, "or
otherwise" acts as a catchall that subsumes the phrase before.
Therefore, the argument goes, "applicant for admission" is a
subset of "otherwise seeking admission." And because iden-
tical words in different parts of a statute are intended to be
defined harmoniously, Defendants posit that "applicants for
admission" must necessarily be "seeking admission" in
§ 1225(b)(2)(A) as well. The *Buenrostro-Mendez* and *Avila*
courts agree. There are, however, several problems with this
argument.

First, under Defendants' analysis, "or otherwise" serves as
an adverb modifying "seeking," leading to the conclusion that
"applicants for admission" is a subset of aliens "otherwise
seeking admission." But Defendants (as well as the two circuit
courts) fail to recognize that this is not the only way to read
this sentence.

The phrase "or otherwise" can also be read to serve an
adjectival function in the clause "who are applicants for
admission or otherwise." Merriam-Webster's Collegiate
Dictionary (10th ed. 1994) (noting that "otherwise" can be
used as an adjective to mean "different"). Read this way, "or
otherwise" serves as a predicate adjective modifying the

pronoun "who."[20] And so, § 1225(c) would apply to noncitizens who are "applicants for admission" *or* aliens who fall into another category. And, again, recognizing this distinction makes sense because a noncitizen can "seek … readmission" even though he may not be an "applicant for admission." *See Gonzaga-Ortega v. Holder*, 736 F.3d 795, 799 (9th Cir. 2013) (noting that "[a lawful permanent resident] returning to the United States ordinarily is not treated as an 'applicant for admission'").

Moreover, grouping "or otherwise" with "who are applicants for admission" would be consistent with Congress's injection of the entire clause into the statute as part of the September 1996 amendments[21] and would avoid the grammatical awkwardness of using "or otherwise" to join two different parts of speech—a noun ("applicants for admission") with a present participle ("seeking").

---

[20] A predicate adjective is an adjective that follows a linking verb such as "be" or "seem" as in the example: "The building is huge." *See Predicate*, Merriam-Webster's Collegiate Dictionary (10th ed. 1994).

[21] The prior version of this provision read:

The inspection, other than the physical and mental examination, of *aliens* (including alien crewmen) *seeking admission or readmission* to or the privilege of passing through the United States shall be conducted by immigration officers, except as otherwise provided in regard to special inquiry officers. All aliens arriving at ports of the United States shall be examined by one or more immigration officers at the discretion of the Attorney General and under such regulations as he may prescribe.

8 U.S.C. § 1225(a) (Apr. 1996) (emphases added).

Second, even if "or otherwise" were to function as an adverb modifying "seeking" as Defendants propose, it can still be read one of two ways. While the phrase may be used to link a set of examples to a general phrase, it can also mean "in a different manner" or "in other respects." *See Fischer v. United States*, 603 U.S. 480, 507 (2024) (Barrett, J., dissenting) (quoting 10 Oxford English Dictionary at 984 (2d ed. 1989) and Webster's Third New International Dictionary 1598 (2002)). It depends on context, *id.*, and context supplies the key here.

When "or otherwise" is used in the first manner, it typically joins words that are the same part of speech, such as the example Defendants provide (and the *Buenrostro-Mendez* court echoes)—a physician's directive to "bike, jog, or otherwise exercise." Reply Br. at 22; *Buenrostro-Mendez*, 166 F.4th at 503. But, as previously noted, in § 1225(c), the phrase "or otherwise" joins different parts of speech—the noun phrase "applicant for admission" and the adjectival present participle "seeking admission or readmission."

Thus, even if we were to adopt Defendants' position that "or otherwise" modifies "seeking," the more natural reading would be to employ its alternative meaning—to refer to something that is "something or anything else." Merriam-Webster's Collegiate Dictionary (10th ed. 1994). Take the sentence: "All students who are football players or otherwise seeking to play football should attend the meeting." In this sentence, student-football-players are not a subset of students who are "otherwise seeking to play football;" they comprise an entirely separate group. *See Buenrostro-Mendez*, 166 F.4th at 518 (Douglas, J., dissenting). In much the same way, in § 1225(c), an "applicant for admission" is different from an alien "seeking admission."

This is not to say that Defendants' reading of § 1225(c) is completely unsupportable. But, of the two interpretations, it is Plaintiffs' construction that takes full account of § 1225(b)(2)(A)'s text and context for the reasons explained. It is also more consistent with the provision's statutory history and background, as we shall see.

### c. The Statutory History and Background

Section 1225's statutory history and background further bespeak its applicability to noncitizens at the border rather than those who reside within the United States. In this way, "[t]he historical context in which the provision was adopted confirms the plain import of its text." *Biden v. Texas*, 597 U.S. at 804; *see also Niz-Chavez v. Garland*, 593 U.S. 155, 165 ("To the extent any doubt remains about the meaning of the two specific statutes before us, we believe a wider look at IIRIRA's statutory structure and history enough to resolve it.").

Before 1996, the INA distinguished between "deportation proceedings" and "exclusion proceedings." The former applied to noncitizens who were present within the United States after unlawfully entering and those who had legal status but were later subject to removal (due to certain criminal convictions, for example). 8 U.S.C. § 1252(a)(1) (1995). In deportation proceedings, the government had the burden of proof. *See Woodby v. I.N.S.*, 385 U.S. 276, 277 (1966) (In deportation proceedings "the Government" had to "establish the facts supporting deportability by clear, unequivocal, and convincing evidence.").

Exclusion proceedings, on the other hand, applied to noncitizens who presented themselves at the border or ports of entry. *See* 8 U.S.C. §§ 1225(a)–(b), 1226(a) (1995). And a

noncitizen who presented himself at the border had the burden to show admissibility. *See Massignani v. I.N.S.*, 438 F.2d 1276, 1277 (7th Cir. 1971) ("The burden of proof of admissibility is upon the alien.").

In 1996, the IIRIRA combined deportation and exclusion proceedings into a single proceeding called "removal proceedings." *See* IIRIRA, 110 Stat. 3009-587–3009-593. Under this approach, a noncitizen, who is admitted but subsequently loses legal status, is removable on grounds of "deportability," 8 U.S.C. § 1227(a), while a noncitizen who was not admitted is subject to removal based on grounds of "inadmissibility," *id.* § 1182(a), whether or not that person is at the border or in the interior. But, as demonstrated below, this restructuring did not expand § 1225(b)(2)(A)'s applicability beyond noncitizens arriving at the border.

Indeed, all the statutory predecessors of § 1225(b)(2)(A), for over a century, expressly focused their attention on the arrival of noncitizens at the country's border or ports of entry. Starting with the Immigration Act of 1893, the relevant provision read:

> [I]t shall be the duty of every inspector of *arriving alien immigrants* to detain for a special inquiry … every person who may not appear to him to be clearly and beyond doubt entitled to admission.

Immigration Act of 1893, § 5, 27 Stat. 569, 570 (1893) (emphasis added).

Similarly, the mandatory detention provision in the Immigration Act of 1903 also focused on arriving noncitizens:

> Every alien who may not appear to the examining immigration inspection at the *port of arrival* to be clearly

and beyond a doubt entitled to land shall be detained for examination in relation therefore by a board of special inquiry.

Immigration Act of 1903, § 24, 32 Stat. 1213, 1219–20 (1903) (emphasis added).

The corresponding provision in the 1952 INA likewise reflected the statute's limited scope:

Every alien (other than an alien crewman), and except as otherwise provided in subsection (c) of this section and in section 273 (d), who may not appear to the *examining immigration officer at the port of arrival* to be clearly and beyond a doubt entitled to land shall be detained for further inquiry to be conducted by a special inquiry officer.

INA of 1952, § 235(b), 66 Stat. 163, 199 (1952) (emphasis added).

And, in 1990, the provision was amended to read:

The *inspection*, … of aliens (including alien crewmen) *seeking admission* or readmission to or the privilege of passing through the United States shall be *conducted by immigration officers* …. All *aliens arriving at ports* of the United States shall be examined by one or more immigration officers …. Every alien … who may not appear to the examining immigration officer at the port of arrival to be *clearly and beyond a doubt entitled to land shall be detained for further inquiry to be conducted by a special inquiry officer*.

8 U.S.C. § 1225(c) (1990) (emphases added). Thus, from 1893 to now, § 1225(b)(2)(A) and its predecessors have been limited

to "port[s] of arrival," "alien[s] seeking entry," or (today) "alien[s] seeking admission."

Despite this century-long history, Defendants now assert that § 1225(b)(2)(A) not only reaches noncitizens at the border or ports of entry, but those living in the interior as well. But, if Congress had intended § 1225(b)(2)(A) to sweep in the millions of noncitizens who are unlawfully in the United States after a century of not doing so, one would "expect more than simple statutory silence" for such "a major departure." *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 465 (2017). After all, "[e]xtraordinary grants of … authority are rarely accomplished through 'modest words,' 'vague terms,' or 'subtle device[s].'" *West Virginia v. Env't Prot. Agency*, 597 U.S. 697, 723 (2022) (quoting *Whitman v. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)). "Nor does Congress typically use oblique or elliptical language to empower an agency to make a 'radical or fundamental change' to a statutory scheme." *Id.* (quoting *MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 229 (1994)). Instead, "[t]he better understanding is that Congress simply streamlined" the statutory language, "which, as any nonlawyer who has picked up the U.S. Code can tell you, is a commendable effort." *United States v. Hansen*, 599 U.S. 762, 778 (2023). Neither Defendants nor the *Buenrostro-Mendez* or *Avila* courts provide any response to this argument.

The legislative history leading to § 1225(b)(2)'s enactment also demonstrates Congress's intent to maintain § 1225(b)(2)'s limited application consistent with this long-standing history. We are mindful, of course, that legislative history is "not the law," *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 523 (2018), but "clear evidence of congressional intent may illuminate

ambiguous text," *Delaware v. Pennsylvania*, 598 U.S. 115, 138–39 (2023) (quotation omitted).

Here, the legislative history could not be clearer. The conference report unequivocally states that "section 235(b) [codified at § 1225(b)] establishes new procedures for the inspection and in some cases removal of aliens *arriving in the United States*." H.R. Rep. No. 104-828, at 209 (1996) (emphasis added). So too does the report of the House Judiciary Committee. H.R. Rep. No. 104-469, pt. 1, at 228 (1996) (stating, "New section 235(b) establishes new procedures for the inspection and in some cases removal of aliens arriving in the United States."). As for noncitizens unlawfully present in the country, the committee report confirmed that "[s]ection 236(a) [codified at § 1226(a)] *restates* the current provisions ... regarding the authority of the Attorney General to arrest, detain, and release on bond an alien who is *not lawfully in the United States*." *Id.* at 229 (emphases added).

But there is more. When enacting § 1225(b) and § 1226(a) in 1996, Congress also passed § 1226(c), which authorized mandatory detention for certain noncitizens, excluding them from the bond proceedings provided in § 1226(a).

Recognizing that this new provision could subject an additional 45,000 noncitizens annually to mandatory detention, Congress was concerned about the government's ability to house such a large increase in detainees and provided the agency with an option to delay § 1226(c)'s implementation for up to two years, which the agency invoked. *See* H.R. Rep. No. 104-469, pt. 1, at 120, 123, 207; IIRIRA, 110 Stat. 3009-586; Memorandum from Michael A. Pearson, Executive Associate Commissioner of Office of Field Operations in the Immigration and Naturalization Service (Oct. 7, 1998),

https://www.ice.gov/doclib/foia/policy/memoDetPolicyAsy-lumICE_Appealed_02.20.2004.pdf at 5.

At the same time, Congress recognized that nearly 1.7 million noncitizens were living within the United States after entering unlawfully. *See* H.R. Rep. No. 104-469, pt. 1, at 111 (estimating that roughly one-half of the approximately 3.4 million "permanent illegal aliens" entered the country illegally). If Congress had intended § 1225(b)(2)(A) to subject almost two million additional individuals to mandatory detention, as Defendants contend, one would think "Congress would have made it explicit in the statute, or at least some of the Members would have identified or mentioned it at some point," as it did with respect to § 1226(c). *Chisom v. Roemer*, 501 U.S. 380, 396 (1991). After all, Congress "does not … hide elephants in mouseholes." *Whitman*, 531 U.S. at 468. In this context, Congress's silence speaks volumes.[22]

---

[22] The *Buenrostro-Mendez* and *Avila* courts reject this line of reasoning, refusing to "speculate about why Congress may or may not have deferred implementation of § 1225(b)(2)(A)" as it did with § 1225(c). *Buenrostro-Mendez*, 166 F.4th at 507; *see also Avila*, 170 F.4th at 1137–38. Rather than considering Congress's purpose, the Fifth and Eighth Circuits preferred to rely on the "statutory text." *Buenrostro-Mendez*, 166 F.4th at 507; *see also Avila*, 170 F.4th at 1138. But, given the explanatory record before us, we are not "required to exhibit a naivete from which ordinary citizens are free." *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d. Cir. 1977). Moreover, the *Buenrostro-Mendez* court itself goes on to rely on its view of congressional purpose in the very next paragraph. *See* 166 F.4th at 507; *see also id.* at 520 (Douglas, J., dissenting) ("Anyway, the majority's reflection on congressional purpose sits oddly beside the statement that '[u]ltimately, … Congress's purpose matters far less than what it wrote[.]'"). And so too does the *Avila* court. *See Avila*, 170 F.4th at 1135 ("The statutory purpose of § 1225 also supports the Government's interpretation of the text.").

The recent amendment to § 1226(c) further reinforces Plaintiffs' reading of § 1225(b)(2)(A). In January 2025, Congress passed the Laken Riley Act, amending § 1226(c) to add § 1226(c)(1)(E), which provides for the mandatory detention of a noncitizen who is:

> inadmissible under paragraph (6)(A), (6)(C), or (7) of section 1182(a) … and is charged with, is arrested for, is convicted of, admits having committed, or admits committing acts which constitute the essential elements of any burglary, theft, larceny, shoplifting, or assault of a law enforcement officer offense, or any crime that results in death or serious bodily injury to another person.

8 U.S.C. § 1226(c)(1)(E).

The first cross reference, § 1182(a)(6)(A), provides that "[a]n alien present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General, is inadmissible." 8 U.S.C. § 1182(a)(6)(A). In other words, § 1226(c)(1)(E) authorizes, among other things, mandatory detention of any noncitizen, who is present in the United States following an unlawful entry, if he has committed various crimes, such as burglary, theft, and assault. If, however, as Defendants argue, § 1225(b)(2)(A) already subjects *all* noncitizens, who are present in the United States after unlawfully entering, to mandatory detention, it would render § 1226(c)(1)(E) entirely redundant. And, as the Supreme Court observed, "the canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013); *see Stone v. I.N.S.*, 514 U.S. 386,

397 (1995) ("When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect.").[23]

For their part, Defendants point out that one of the IIRIRA's goals was to equalize the treatment of noncitizens who presented themselves at the border with those who were already in the country illegally. And, in their view, requiring mandatory detention for all noncitizens furthered this goal. This is half-correct.

Congress was concerned that noncitizens present in the country following an unlawful entry had certain "equities and privileges" not available to noncitizens who presented themselves at the border. And, to address this disparity, the IIRIRA provides that an unadmitted noncitizen bears the burden to prove admissibility in removal proceedings, whether he arrived at the border or was found in the country, thereby eliminating the disparity in the prior statutory scheme. *See* H.R. Rep. No. 104-469, pt. 1, at 225 (recognizing the difference in "equities and privileges" and stating, "Hence, the pivotal factor in determining an alien's status will be whether or not the alien has been lawfully admitted.").

---

[23] Adopting Defendants' argument, the *Buenrostro-Mendez* court says there is no redundancy because the recent amendments to § 1225(c) eliminated parole for certain identified categories of noncitizens. 144 F.4th at 504. But the Act already contains sections that specifically address parole. *See, e.g.,* 8 U.S.C. §§ 1182(d)(5), 1184(f)(2). If Congress's primary purpose was to eliminate parole for certain individuals, it is reasonable to think that Congress would have simply added such exceptions to these provisions. *See Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990) ("We assume that Congress is aware of existing law when it passes legislation.").

Rather than pointing to specific legislative history pertaining to § 1225(b)(2)(A) (or even § 1225 generally), Defendants rely on expressions of Congress's general intent to eliminate the preferential treatment of noncitizens present in the country after an unlawful entry as compared to those who present themselves at the border or a port of entry. Reply Br. at 33. But not only does Defendants' interpretation of § 1225(b)(2)(A) run counter to its text and context, but "[i]n analyzing legislative history, specificity breeds credibility." *United States v. Meade*, 175 F.3d 215, 219 (1st Cir. 1999). Thus, the "particularized explanations of how specific provisions of an act are meant to work have been deemed more instructive than generalized pronouncements" about "statutory purpose." *Id.* Here, the legislative history *specific to* § 1225(b) evinces Congress's desire to limit its application to noncitizens at the border or ports of entry.

Defendants and the *Buenrostro-Mendez* court also rely heavily on the agency's own interpretation of the legislative history set forth in *Matter of Yajure Hurtado*, 29 I. & N. Dec. 216 (BIA 2025). But the Board of Immigration itself "acknowledge[d] that for years Immigration Judges have conducted bond hearings for aliens who entered the United States without inspection." *Id.* at 225 n.6. In any event, the BIA's adoption of Defendants' novel legal argument is not binding on this court and erroneous in any event for the reasons already explained. *See Loper Bright*, 603 U.S. at 394 ("[C]ourts must exercise independent judgment in determining the meaning of statutory provisions.").

In short, nothing in the statutory text or history supports Defendants' contention that Congress wanted to apply

mandatory detention equally to both categories of noncitizens. In fact, as we have seen, the opposite is true.

### d. The Government's Understanding

The government's contemporaneous and long-held understanding of § 1225(b)(2)(A) is also relevant to our inquiry. *See Learning Res., Inc. v. Trump*, 146 S. Ct. 628, 643 (2026) (noting that "the fact that no President has ever found such power in [the statute] is strong evidence that it does not exist") (plurality opinion); *see also Biden v. Texas*, 597 U.S. at 805 (The "novelty" of a re-interpretation of IIRIRA that contradicts "every Presidential administration['s] interpretation for the past 26 years "bears mention."); *Biden v. Nebraska*, 600 U.S. 477, 519 (2023) (Barrett, J., concurring) ("A longstanding want of assertion of power by those who presumably would be alert to exercise it may provide some clue that the power was never conferred.") (citation modified).

It is undisputed that, since the IIRIRA's enactment in 1996, the government has never asserted its novel claim that § 1225(b)(2)(A) authorizes the mandatory detention of noncitizens already present in the interior of the country. That is, until July 10, 2025, when ICE issued interim guidance announcing that applicants for admission "are subject to mandatory detention under [8 U.S.C. § 1225(b)] and may not be released from DHS custody except" through parole. Memorandum from Rodney S. Scott, U.S. Customs and Border Protection Commissioner (July 10, 2025) https://www.cbp.gov/sites/default/files/2025-09/intc-46100_-_c1_signed_memo_-_07.10.2025.pdf.

In fact, Solicitors General and their deputies under both President Obama and President Trump have represented to

the Supreme Court that only § 1226(a), not § 1225(b)(2)(A), applied to those living in the interior. *See Jennings v. Rodriguez*, 583 U.S. 281 (2018) (No. 15-1204) (Nov. 30, 2016), Oral Argument at 04:48–06:20 (Acting Solicitor General stating that "an alien who has come into the United States illegally without being admitted who takes up residence is … held under 1226(a) and … get[s] a bond hearing."); *Rodriguez*, 583 U.S. 281 (Oct. 3, 2017) (on reargument), Oral Argument at 10:02–10:27 (Deputy Solicitor General stating that "1226 is the provision that we use when we arrest somebody who … is within the United States; 1225 is the one we use when we are dealing with aliens who arrive at our shores.").

In the words of the Supreme Court, "it is … telling that in" § 1225(b)(2)(A)'s thirty years of existence "no President has invoked the statute to impose" mandatory detention on the millions of noncitizens living in the United States who have entered unlawfully. *Learning Res.*, 146 S. Ct. at 640. "[T]he fact that no President has ever found such power" in the IIRIRA "is strong evidence that it does not exist." *Id.* at 643.[24]

---

[24] The *Buenrostro-Mendez* court discounts the government's decades-long practice, believing that "prior Administrations decided to use less than their full enforcement authority under § 1225(b)(2)(A)." 144 F.4th at 506. But the Federal Register passages it cites (*i.e., Detention and Removal of Aliens*, 62 Fed. Reg. 10312, 10323 (Mar. 6, 1997)) do not support the contention that § 1225(b)(2)(A)'s mandatory detention authority was intended to encompass all noncitizens within the United States who unlawfully entered. To the contrary, it is consistent with the government's long-standing view that such noncitizens are entitled to bond under § 1226. *See id.* ("Despite being applicants for admission, aliens who are present without having been admitted or paroled … will be eligible for bond and bond redetermination.").

One final point. Consider the number of times the courts in *Buenrostro-Mendez* and *Avila* as well as the dissenting opinion invoke an exception to a widely-applied rule of statutory construction to arrive at their conclusion. For example, their reading renders inapplicable: the rule requiring us to strictly apply Congressional definitions; the rule against surplusage; the rule respecting Congress's usage of grammer; the rule that a provision's title is a clue to its meaning; the rule that, when faced with ambiguous statutory language, specific indications of legislative intent overrule the more general; the rule that the contemporaneous and historic interpretation and practices of the Executive matter; and so on. That they must rely more on exceptions rather than the rules is telling. By contrast, the present construction gives effect to the statute's every word and takes into full account its context and historical background.

*      *      *

In summary, the text, statutory context, legislative history, and long-standing Executive practice all confirm that § 1225(b)(2)(A) applies to "applicants for admission" who are seeking lawful entry at the border or ports of entry and not to noncitizens unlawfully living in the country's interior. Given the statute's history, it is unreasonable to think that Congress in 1996 intended to subject millions of noncitizens to mandatory detention in the oblique, off-handed fashion that Defendants claim. Thus, Defendants lacked the authority in the first instance to place the individuals at issue, all of whom were already within the United States, under mandatory detention pursuant to § 1225(b)(2)(A).

**2. Release of "Potential" Class Members**

Lastly, we remain convinced that the Consent Order does not authorize the district court to release "potential" class members. In Section IV(E)(1) of the Consent Decree, the parties agreed that a detained "Class Member" would be released from ICE custody "upon a determination by the Parties or the Court ... that [the] Class Member was so arrested contrary to the terms of the Agreement." Dkt. 155-1 at 8. Here, no such determination has been made for the approximately 200 "potential class members" who remain the subjects of the November 13 order.

Nor do we think the discretion the court retained under Section V(B)(2) to "provide any equitable remedies not otherwise specified in this Agreement" would override the specific remedy delineated in Section IV(E)(1). *Id.* at 10. Thus, under the terms of the Consent Decree, an individual subject to a warrantless arrest may be released only after an individualized determination that he was arrested in violation of § 1357(a)(2).

### III. Conclusions

For the reasons stated, we affirm the October 7 order insofar as it extended the Consent Decree by 118 days. We also affirm the November 13 order to the extent it orders the release of class members for whom a determination has been made that they were arrested without a warrant in contravention of 8 U.S.C. § 1357(a) and the Consent Decree. That said, we reverse the November 13 order to the extent it requires the release of "potential class members" and any person who was arrested pursuant to an I-200 warrant (defective or otherwise).

PRYOR, *Circuit Judge*, concurring in part and concurring in the judgment. I join the portion of Judge Lee's opinion holding that the Department of Homeland Security and the U.S. Immigration and Customs Enforcement waived reliance on 8 U.S.C. § 1252(f)(1)'s bar on classwide injunctive relief when they entered the Consent Decree and that the district court did not abuse its discretion in extending the Consent Decree's terms due to Defendants' substantial noncompliance. I therefore join in the judgment to affirm the October order. I also join in the judgment to affirm in part the November order releasing class members arrested in violation of 8 U.S.C. § 1357(a) and the Consent Decree and reverse the judgment of the district court releasing "potential class members" and to remand for individual determinations.

I do not join the portion of the opinion (Part II-B-1) reaching the merits of the Plaintiffs' argument that the Defendants' interpretation of 8 U.S.C. § 1225(b)(2)(A) is improper. I come to my conclusion with respect to the November order, by way of a different path. In my view, similar to our holding in regard to the October order, I would find the Defendants waived the argument that the district court's November order violates § 1252(f)(1) because it restrained the Defendants' ability to mandatorily detain "potential class members" pursuant to 8 U.S.C. § 1225(b)(2)(A). For that reason, I do not reach the legality of Defendants' interpretation of § 1225(b)(2)(A). Unlike Judge Lee, if the issue were not waived, I find the § 1252(f)(1)'s bar on classwide injunctive relief prevented the district court from reaching the merits of whether Defendants' interpretation and operation of § 1225(b)(2)(A) is lawful. *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550–54 (2022).

Moreover, when the parties entered the Consent Decree, they shared an understanding of who was subject to mandatory detention under § 1225(b)(2)(A) of the Immigration and Nationality Act: individuals who were apprehended at our country's borders and shores. *See generally* Brief for Respondent United States of America, Biden v. Texas, 597 U.S. 785 (2022), No. 21-954. Therefore, the November order did not run afoul of the Consent Decree's ban on releasing individuals subject to mandatory detention because Defendants' later reinterpretation, made without filing a motion to modify under Federal Rule of Civil Procedure 60(b), cannot nullify the parties' mutual assent to the meaning of those terms at the time they entered the Consent Decree.

Therefore, I concur in part and concur in the judgment.

## I.    BACKGROUND

In Judge Lee's opinion, he has ably and methodically provided the factual background and procedural history of this case. To prevent repetition, I seek to highlight only what is necessary for me to resolve Defendants' appeal of the November order.

### A.  Consent Decree

In 2018, Plaintiffs sued Defendants, alleging they were conducting warrantless arrests of noncitizens without probable cause in violation of 8 U.S.C. § 1357(a)(2). After two years of litigating, the parties engaged in settlement negotiations to resolve their dispute. And in 2022, the parties submitted their settlement agreement to the district court for approval. The parties also requested it certify a class under Federal Rule of Civil Procedure 23(e) consisting of "All current and future persons arrested without a warrant for a civil violation of U.S.

immigration laws within the area of responsibility of the ICE Chicago Field Office." The district court certified the class, approved the settlement agreement, and entered an order treating the settlement agreement as a Consent Decree.[1]

The Consent Decree provided the process by which the parties would address any future allegations that Defendants had violated the terms of the Consent Decree.[2] If, say, Defendants arrested someone in violation of § 1357(a)(2), the Consent Decree required the parties to first meet and confer in an attempt to resolve the dispute. If that was unsuccessful, they had to present the issue to the district court for resolution. Under either path, a determination that a class member was arrested in violation of § 1357(a)(2) entitled the person to the Consent Decree's individualized remedy: the noncitizen was required to be released from custody as soon as practicable without bond or conditions of release. The remedy, however, did "not apply" "to [c]lass [m]embers subject to mandatory detention pursuant to the Immigration and Nationality Act."

At the time they entered the Consent Decree, the Defendants' longstanding position was that § 1225(b)(2)(A) authorized mandatory detention of noncitizens detained at the border of the United States or its shores as opposed to noncitizens seized within the interior of the United States—their detention was governed instead by 8 U.S.C. § 1226. *See generally* Brief for Respondent United States of America, Biden v. Texas, 597 U.S. 785 (2022), No. 21-954. Despite its 30-year interpretation of § 1225(b)(2)(A), the Defendants announced on

---

[1] District Ct. Dkt. 158 - Order Approving Consent Decree.

[2] District Ct. Dkt. 155-1 at 10–11 - Settlement Agreement and Release.

July 10, 2025, that they had "revisited its legal position on detention and release authorities" under the Immigration and Nationality Act. Memorandum from Rodney S. Scott, U.S. Customs and Border Protection Commissioner (July 10, 2025) https://www.cbp.gov/sites/default/files/2025-09/intc-46100_-_c1_signed_memo_-_07.10.2025.pdf. Effective that day, the government would mandatorily detain noncitizens "regardless of when or where" they were encountered. *Id.* In other words, Defendants announced a new interpretation of § 1225(b)(2)(A) that subjected noncitizens apprehended either within the United States or at our borders to mandatory detention. *Id.*

### B. Procedural History

After years without issues being brought to the district court's attention, on March 13, 2025, Plaintiffs moved to enforce the Consent Decree. They argued the Defendants had arrested 26 individuals in violation of § 1357(a)(2) and thus the Consent Decree. Roughly a month later, on April 14, 2025, Plaintiffs filed a motion pursuant to Federal Rule of Civil Procedure 60(b)(5) to modify the Consent Decree. In their view, extension of the Consent Decree's terms was warranted based on Defendants' repeated and material noncompliance.

The district court granted the first motion in relevant part and the second on October 7, 2025. As for the motion to modify, it concluded the record supported a finding that Defendants had failed to substantially comply with the Consent Decree and extended its terms by 118 days. The district court also ordered Defendants to produce arrest records for individuals seized between June 11, 2025, and October 7, 2025, whose arrests were potential violations, so individualized dispute resolution could begin.

On October 17, 2025, Defendants filed a motion requesting an eight-week extension to provide Plaintiffs with the arrest records the district court ordered they produce to Plaintiffs. In the same motion, Defendants acknowledged that they had identified 1,852 arrests that potentially violated the Consent Decree. Plaintiffs responded on October 20, 2025, opposing Defendants' request for an extension because such a delay would cause irreparable harm. They also cross-moved for interim relief. Specifically, Plaintiffs sought a court order placing "potential class members" on ankle monitors or other alternatives to detention. Defendants opposed Plaintiffs' requested interim relief. The district court granted Defendants' extension request on October 20, 2025, and four days later, it ordered the parties to file simultaneous briefs by October 31, 2025, on whether it could release potential class members on alternatives to detention, which the parties timely filed.

On November 7, 2025, the parties notified the district court of arrests they agreed violated the Consent Decree. And at a hearing on November 12, 2025, the parties, as relevant here, confirmed the arrests of 13 class members violated the Consent Decree yet they remained in custody. Defendants, though, opposed their release because they asserted for the first time that these individuals were being mandatorily detained pursuant to § 1225(b)(2)(A). On November 13, 2025, the district court ordered the release of the 13 individuals and granted Plaintiffs' broader request for relief to place "potential class members" on alternatives to detention, save for those individuals Defendants identified as posing a high risk of danger to the public.

Defendants timely appealed the district court's October and November orders.

## II.   DISCUSSION

I concur with Judge Lee's analysis and disposition of the October order and do not repeat that here. With respect to the November order, Defendants lodge three challenges. I address them in turn.[3]

### A. Waiver

Defendants insist the November order runs afoul of § 1252(f)(1)'s bar on classwide injunctive relief. Plaintiffs contend Defendants waived this argument by entering the Consent Decree. I agree.

Section 1252(f)(1) states that "[r]egardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of [8 U.S.C. §§ 1221–1232] … other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated." Pointing to their mandatory detention authority under § 1225(b)(2)(A), which they now claim covers noncitizens arrested within the country's borders, Defendants argue the November order impermissibly restrains the operation of a provision covered by § 1252(f)(1).

Certain arguments invoking § 1252(f)(1) can be waived. *See supra* Opinion of Lee, J., Part II-A-1-a; *accord Biden v. Texas*, 597 U.S. 785, 797–801 (2022). And "[c]onsent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms." *United States v.*

---

[3] I agree with Judge Lee that we have jurisdiction to review the November order. *See supra* Opinion of Lee, J., Part II-B n.12.

*Armour & Co.*, 402 U.S. 673, 681 (1971). At the heart of a consent decree lies "a compromise" because "in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation." *Id.* In doing so, "[t]he parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation." *Id.*

Here, the parties entered the Consent Decree after two years of litigation and two years of negotiation, spanning two presidential administrations. They artfully crafted the terms of it, dispensing with potential success had the case gone to judgment and defenses or arguments either may have had in exchange for a mutually beneficial system of enforcement and dispute resolution. *Cf. McDowell v. Philadelphia Housing Authority (PHA)*, 423 F.3d 233, 239 (3d Cir. 2005) (Alito, J.) ("Because the decree compromises litigation, it will rarely afford the plaintiffs all the relief they would have obtained had the case proceeded to a judgment in their favor."); *Chisom v. Louisiana ex rel. Landry*, 116 F.4th 309, 318 (5th Cir. 2024) ("The whole point of negotiating and agreeing on a plethora of specific, highly detailed action plans was to establish a clearly defined roadmap for attempting to achieve the Decree's purpose." (quoting *Frew v. Janek*, 780 F.3d 320, 328 (5th Cir. 2015))). By entering into the Consent Decree, then, Defendants intentionally relinquished known rights. *Armour*, 402 U.S. at 681. In other words, Defendants waived their argument that § 1252(f)(1) prohibits injunctive relief restraining the operation of any covered provision found in § 1252(f)(1), including § 1225(b)(2)(A), and cannot now seek haven in a waivable statutory provision they forwent to receive the benefit of their bargain to resolve the claims against them. *See Miller v. Willow Creek Homes, Inc.*, 249 F.3d 629, 631 (7th Cir. 2001) ("A waiver,

which can be either expressed or implied, is an intentional re-linquishment of a known right.").

### B. Section 1252(f)(1)

I stop there and venture no further. The district court, however, reached the merits of Defendants' interpretation of their mandatory detention authority under § 1225(b)(2)(A), rejected that interpretation, and issued a classwide release of noncitizens on alternatives to detention. That was error.

Without a binding consent decree, the door to the merits of this argument is closed; § 1252(f)(1) prohibits classwide injunctive relief of a covered statutory provision. Section "1252(f)(1) generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Aleman Gonzalez*, 596 U.S. at 550. The parties do not disagree that § 1225(b)(2)(a) falls among the specified provisions. The Supreme Court has explained that § 1252(f)(1) "'prohibits federal courts from granting classwide injunctive relief' but 'does not extend to individual cases.'" *Id.* (quoting *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481–82 (1999)). Section 1252(f)(1)'s classwide injunctive relief bar applies even where the government is "misinterpreting and misapplying" a covered statutory provision. *Id.* at 553–54.[4]

Therefore, even if Defendants are unlawfully deploying their authority under § 1225(b)(2)(A), lower courts cannot

---

[4] I agree with Judge Lee that a classwide injunction does not run into § 1252(f)(1)'s bar if it only "has some collateral effect on the operation of a covered provision." *Aleman Gonzalez*, 596 U.S. at 553 n.4. But I don't see this issue arising under these facts.

enjoin operation of it on a classwide basis. *Id.* at 553–54. But, as described above, Defendants waived reliance on § 1252(f)(1) by agreeing to the Consent Decree. Because courts should endeavor to resolve issues on the narrowest grounds available, that is all that is necessary to resolve this issue.

### C. Mandatory Detention

As a final arrow in their quiver, Defendants argue the November order violates the terms of the Consent Decree in two ways. First, they maintain that the Consent Decree's carve out of class members subject to mandatory detention from its remedial procedures incorporated its newfound definition of § 1225(b)(2)(A). Second, Defendants contend the November order's grant of widespread release of noncitizens without an individualized determination that any of their arrests were permissible was incompatible with the Consent Decree's command that release of a class member could result only "upon a determination by the parties or the Court … that a Class Member was so arrested contrary to the terms of th[e] [Consent Decree]." While I disagree with Defendants' first argument, I agree with their second.

Consent Decrees are creatures of contract, and "they should be construed basically as contracts," using the familiar aids of contract interpretation. *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 236 (1975).[5] "Such aids include the circumstances surrounding the formation of the consent [decree], any technical meaning words used may have had to the

---

[5] The parties agree the interpretation of the Consent Decree is construed in accordance with federal common law, which incorporates "general principles of contract law." *Bock v. Computer. Assocs. Int'l, Inc.*, 257 F.3d 700, 704 (7th Cir. 2001).

parties, and any other documents expressly incorporated in the decree." *Id.* at 238. The ultimate "objective" is to "constru[e] [the] contract … to give effect to the intentions of the parties." *Lumpkin v. Envirodyne Indus., Inc.*, 933 F.2d 449, 455 (7th Cir. 1991) (quoting *Air Line Stewards & Stewardesses Ass'n v. Am. Airlines, Inc.*, 763 F.2d 875, 877–78 (7th Cir. 1985)); *United States v. Rand Motors*, 305 F.3d 770, 774 (7th Cir. 2002) ("[W]e attempt to construe a contract to give full effect to the intention of the parties."). To do so, we "apply an objective standard of reasonableness to determine the meaning of the settlement agreement," *Rand Motors*, 305 F.3d at 774, and keep in mind "[t]he principle that a contract is construed to give effect to all of its provisions." *First Nationwide Bank v. United States*, 431 F.3d 1342, 1347 (Fed. Cir. 2005). At the same time, "the scope of a Consent Decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it." *Armour*, 402 U.S. at 682.

The Consent Decree specifies that its individual remedy provisions do not apply "to Class Members subject to mandatory detention pursuant to the Immigration and Nationality Act." The Consent Decree neither defines mandatory detention nor specifies a particular statutory provision under the Immigration and Nationality Act. But at the time the parties entered into the agreement, they shared an understanding of what the provision meant. *See Loc. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 522 (1986) ("[T]he agreement of the parties, rather than the force of the law upon which the complaint was originally based, … creates the obligations."). Defendants and Plaintiffs contemporaneously agreed that § 1225(b)(2)(A) authorized the government to mandatorily detain individuals who it seized at the country's border and shores, whereas § 1226 permitted it to

release citizens who it apprehended within the United States on bond. *See* Detention and Removal of Aliens, 62 Fed. Reg. 10312, 10323 (Mar. 6, 1997) ("Despite being applicants for admission, aliens who are present without having been admitted or paroled … will be eligible for bond and bond redetermination."); *see, e.g.*, *Matter of Castillo-Padilla*, 25 I. & N. Dec. 257, 257–58, 262 (BIA 2010) (observing a noncitizen who was present without admission or parole was released under § 1226); *Matter of Akhmedov*, 29 I. & N. Dec. 166 (BIA 2025) (stating where a noncitizen entered without inspection at the border "[t]he respondent's custody determination is governed by the provisions of section [1226]"); *Jennings v. Rodriguez*, 583 U.S. 281 (2018) (No. 15-1204) (Nov. 30, 2016), Oral Argument at 04:48–06:20 ("[A]n alien who has come into the United States illegally without being admitted who takes up residence … is … held under 1226(a) and … get[s] a bond hearing."); *Rodriguez*, 583 U.S. 281 (Oct. 3, 2017), Oral Argument at 10:02–10:27 ("1226 is the provision that we use when we arrest somebody who is within the … United States; 1225 is the one we use when we are dealing with aliens who arrive at our shores."). Were that not the case, to the extent those individuals would be subject to mandatory detention, the Consent Decree's remedial provision would not have aided any class member or "potential class member," rendering this provision completely superfluous. That's absurd.

Then, fast forwarding three years, the government concedes it changed course in interpreting § 1225(b)(2)(A) to permit it to mandatorily detain noncitizens regardless of whether they were apprehended at the border or within the United States after nearly 30 years of contending the opposite. *See Aparecido Barbosa da Cunha v. Freden*, No. 25-3141-pr, slip op. at 52–53 (2d Cir. Apr. 28, 2026). Even though the Defendants

ushered in a unilateral 180-degree change in interpretation of a key term of the Consent Decree, they never requested the district court amend the Consent Decree's terms. But "[w]hen a court has embodied the settlement agreement in a judicial decree, Federal Rule of Civil Procedure 60(b) governs modifications." *Daniels v. Hughes*, 147 F.4th 777, 785 (7th Cir. 2025).

Here, the Department of Homeland Security and the U.S. Immigration and Customs Enforcement have refused to take the legally prescribed path to seek relief from the Consent Decree. They, instead, unilaterally sought to circumvent their contractually assented to terms and cease their obligations imposed by court order. Our system of government does not condone such lawlessness. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803) ("The government of the United States has been emphatically termed a government of laws and not of men."). Indeed, inscribed in the American rule of law rests the fundamental principle that federal courts say what the law is and require every single person subject to the law to follow its dictates, processes, and procedures. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 654 (R. Jackson, J., concurring) (1952) ("The essence of our free Government is 'leave to live by no man's leave, underneath the law'—to be governed by those impersonal forces which we call law."). That's the only way our system of government can properly function. *Cooper v. Aaron*, 358 U.S. 1, 23 (1958) (Frankfurter, J., concurring) ("'A government of laws and not of men' was the rejection in positive terms of rule by fiat, whether by the fiat of governmental or private power. Every act of government may be challenged by an appeal to law, as finally pronounced by [the Supreme] Court.").

In short, Defendants must be held to the bargain they struck. Without properly moving for modification under Rule 60(b), the Defendants could not on their own accord rewrite the Consent Decree to encompass the government's new-found definition of mandatory detention pursuant to § 1225(b)(2)(A).

On the other hand, for the reasons stated in Judge Lee's opinion, the November order did run afoul of the Consent Decree's requirement that class members and "potential class members" be subject to individualized determinations regarding whether they had been arrested in violation of the Consent Decree's terms. As stated, the Consent Decree mandates release of a class member from custody "upon a determination by the Parties or the Court ... that [the] Class Member was so arrested contrary to the terms of the Agreement." No such determination has been made for the "potential class members" who remain the subjects of the November 13 order. Thus, remand is necessary for individualized review of whether the potential class members are in fact members of the class subject to the Consent Decree's terms.

### III.    CONCLUSION

For the reasons stated above, I concur in part and concur in the judgment.

KIRSCH, *Circuit Judge*, dissenting. The majority concedes that the district court's orders were deeply flawed. By enjoining the government from using I-200 warrants in its October order, the district court ran afoul of the Immigration and Nationality Act's injunction bar. My colleagues nonetheless affirm the remainder of that order. The November order required the government to release hundreds of aliens at once, in violation of the terms of the consent decree. No matter, the majority says, the rest of that order should stand as well. There are other problems, too, beyond those my colleagues acknowledge. The district court failed to consider the separation of powers principles that make this case unique. The class-wide injunctive relief in the November order was barred by the Immigration and Nationality Act and the Supreme Court's decision in *Garland v. Aleman Gonzalez*, 596 U.S. 543 (2022). And the district court erred in its interpretation of mandatory detention, limiting the broad reach of 8 U.S.C. § 1225 just to those aliens encountered at the borders and ports of entry. We should have taken a different course: we should vacate and remand both orders. I respectfully dissent.

I

This lawsuit began in 2018. Plaintiffs alleged that Immigration and Customs Enforcement made arrests in violation of 8 U.S.C. § 1357(a)(2), which sets requirements for warrantless arrests. Though the class action was filed during President Trump's first term in office, the parties settled—and entered a consent decree—during the Biden administration. Plaintiffs gave up their litigation in exchange for a promise that, for a period of three years, ICE officers assigned to the Chicago area could make arrests under § 1357 only if they had probable cause that an individual was in the United States in

violation of the immigration laws and probable cause that the individual was likely to escape before a warrant could be obtained. The agreement included an individualized remedy: if the parties or court found that a class member was arrested in violation of the decree, ICE had to release that person unless they were "subject to mandatory detention pursuant to the Immigration and Nationality Act." The court also retained discretion to provide equitable remedies.

For two-and-a-half years, the case went quiet. But after President Trump returned to office and ICE began intensive operations in the Chicago area, the litigation sprang back to life. Citing arrests that they alleged were in violation of the consent decree, plaintiffs filed a motion to enforce in March 2025, which put the expiration of the agreement on hold. A month later, they moved under Federal Rule of Civil Procedure 60(b)(5) to extend the agreement by another three years.

On October 7, 2025, the district court ruled on both motions (the October order). Considering the motion to enforce, the district court found that 22 of the 26 arrests identified by plaintiffs were, in fact, warrantless arrests in violation of the consent decree. The parties agreed that 14 of the arrests were warrantless, and the court found that 12 of those were in violation of the agreement. But there was a dispute about the nature of the remaining 12 arrests. Plaintiffs argued that these arrests were also warrantless, made under the authority of § 1357(a)(2). ICE contended that these arrests were supported by warrants issued in the field (using a warrant form called an I-200) and were based on authority under a different statute—8 U.S.C. § 1226—such that the consent decree did not apply. The district court decided that ICE's I-200 warrant practice was unlawful, that the arrests had been warrantless, and

that most of the I-200 arrests were in violation of the decree. The court granted plaintiffs' motion to enforce in part, ordering ICE to provide relief to those arrested in violation of the agreement.

The district court also granted plaintiffs' motion to modify the agreement under Federal Rule of Civil Procedure 60(b)(5). Citing an email from ICE's Principal Legal Advisor that purported to rescind the consent decree because it was expired and ICE's I-200 field warrant policy, the court found that ICE was in substantial non-compliance with the decree and that plaintiffs had shown a significant change of circumstances warranting a modification. The district court extended the decree for an additional four months.

Weeks later, plaintiffs moved to release "all potential class members" from ICE detention and instead place those aliens on ankle monitors and other alternatives to detention. The government argued that under a new interpretation of part of the INA—8 U.S.C. § 1225(b)(2)—aliens arrested in the Chicago area were subject to mandatory detention, meaning that ICE could not lawfully release them. The district court disagreed with the government's interpretation of § 1225. Without deciding whether the detained aliens were in the class or had been arrested contrary to the consent decree, the court ordered hundreds of detainees released and stayed their removal for one day after their release.

The government moved to stay both orders pending appeal, and we denied in part and granted in part that motion. See *Castañon-Nava v. U.S. Dep't of Homeland Sec.*, 161 F.4th 1048 (7th Cir. 2025). On appeal, the government challenges the extension of the October order and the entirety of the November order.

II

We review the district court's orders for an abuse of discretion. *Shakman v. Clerk of Cook Cnty.*, 994 F.3d 832, 840 (7th Cir. 2021). "The abuse-of-discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions." *Koon v. United States*, 518 U.S. 81, 100 (1996). Abuse of discretion also includes "a serious error of judgment, such as reliance on a forbidden factor or failure to consider an essential factor." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 782 (7th Cir. 2017). When a district court abuses its discretion, the court of appeals may "vacate the original decision and remand to the district court to perform its task in the manner it should have carried out originally." *United States v. Stephens*, 514 F.3d 703, 713 (7th Cir. 2008).

The district court committed errors in both orders. The October order exceeded the court's jurisdiction because it granted class-wide injunctive relief enjoining ICE's operation of § 1226 (barring the government from issuing I-200 warrants in the field). See 8 U.S.C. § 1252(f)(1); *Aleman Gonzalez*, 596 U.S. at 548. And the district court abused its discretion in the November order by requiring the release, en masse, of hundreds of potential class members contrary to the decree's individualized remedy. In addition to these errors—which the majority acknowledges—the district court also abused its discretion in both orders by failing to consider the separation of powers, and, in the November order, by enjoining ICE's use of mandatory detention contrary to § 1252(f)(1) and based on an erroneous interpretation of the INA. We should vacate and remand both orders.

A

The district court abused its discretion in the October order for two reasons. First, the court failed to take account of a factor essential to its decision—that this case involves an agreement entered by temporary officeholders of the executive branch and so involves the public interest and separation of powers. Second, the district court exceeded its jurisdiction and violated the INA's injunction bar—8 U.S.C. § 1252(f)(1)— by preventing the government from issuing I-200 warrants in the field. Considered alone or together, these errors require that we vacate the decision to extend the decree.

1

Consent decrees are, in some respects, like contracts. See *United States v. Alshabkhoun*, 277 F.3d 930, 933–34 (7th Cir. 2002). In a typical contract dispute, it's the parties to the agreement whose interests matter. But when temporary officeholders of the executive branch are on one side of the deal, the calculus changes. The public has a stake in the degree to which the executive branch barters away its powers. See *Evans v. City of Chicago*, 10 F.3d 474, 478 (7th Cir. 1993) (en banc) (plurality opinion). And a district court that exercises control over executive functions through a consent decree must do so with "due regard for the separation of powers, the flexibility of equity, the ambiguity of the decree … the sensitivity and importance of the subject matter, and the limitations of judicial competence." *All. to End Repression v. City of Chicago*, 742 F.2d 1007, 1019 (7th Cir. 1984) (en banc).

Attention to this factor isn't optional. "As both the Supreme Court and this court have made clear, the district court's recognition of the uniqueness of [institutional reform

litigation] *must* inform its decision whether to grant or deny a motion brought pursuant to Rule 60(b)." *Shakman v. City of Chicago*, 426 F.3d 925, 934 (7th Cir. 2005) (emphasis added); *Gopalratnam*, 877 F.3d at 782 (finding an abuse of discretion when a court failed to consider a factor essential to its analysis). Interpreting and modifying promises made by temporary officeholders, the court should preserve "maximum leeway for democratic governance." *Evans*, 10 F.3d at 479. That's because governments are unlike other contracting parties, and "temporary officeholders may not contract away the basic powers of government … in the same way natural persons may make enduring promises about their own future behavior." *Id.* at 478.

In modifying the decree, the district court proceeded as if this were a usual contracts case. It broadly interpreted not just the meaning of the agreement but also the surrounding law, including a provision that the consent decree didn't address at all (§ 1226). Recall that the decree centers on just one part of the immigration law: warrantless arrests under § 1357. Plaintiffs alleged that ICE had violated that provision, but the district court went way beyond warrantless arrests. It declared that ICE's I-200 field warrants—issued under § 1226, an entirely different statute—were unlawful. And based on that interpretation of § 1226 and related violations of the agreement, as it saw them, the district court extended the consent decree by four months. In doing so, the court both bound current elected officeholders to the promises of their predecessors and went beyond those limited promises (which centered only on § 1357), barring ICE from using warrants in a way the government believes is lawful. Because the court failed to appreciate the unique nature of this case, it overplayed its role and created an unnecessary conflict between the judicial and

executive branches. See *All. to End Repression*, 742 F.2d at 1019. This was an abuse of discretion.

My colleagues excuse this error, relying on waiver. *Ante*, at 17. But the government did not waive argument on this point. Responding to plaintiffs' motion to modify, the government cited cases discussing the need for courts to take a flexible approach to proposed modifications of consent decrees binding public officials. See *Shakman v. Pritzker*, 43 F.4th 723, 731 (7th Cir. 2022) (noting that extended federal judicial oversight of executive officials "should not serve as a primary means of ensuring state officials comply with duties imposed by federal law"); *Shakman*, 426 F.3d at 932 ("The public interest and considerations based on the allocations of powers within our federal system require that the district court defer to … government administrators who have the primary responsibility for elucidating, assessing, and solving the problems of institutional reform, to resolve the intricacies of implementing a decree modification."). The government didn't use the magic words "separation of powers," but it didn't need to. The authority the government cited adequately raised the unique aspects of institutional reform litigation. And even if it hadn't, we should reach the issue now because the court retains "the independent power to identify and apply the proper construction of governing law." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991).

Waiver aside, the majority contends that we should rest easy about any separation of powers problems because the government could ask to end the decree under Rule 60(b)(5), and because the decree's continued vitality depends "on the existence of a substantial claim under federal law." *Ante*, at 18–19 (quoting *Evans*, 10 F.3d at 480). I agree that these are

important safeguards on institutional reform litigation. But my colleagues ignore a third guardrail: adequate judicial attention to the unique aspects of these cases. See *Shakman*, 426 F.3d at 934; *Evans*, 10 F.3d at 479; *All. to End Repression*, 742 F.2d at 1019.

That the government can move to modify the decree, and that the decree must rise or fall with a substantial claim, does not mean the court may exercise control over institutional reform litigation however it sees fit. We have a "responsibility to identify the rule of federal law supporting a consent decree binding the political arms of government, and the corresponding obligation to permit new public officials to set their own policy within the limits established by federal law." *Evans*, 10 F.3d at 479. The October order ignored these obligations. It exceeded the "appropriate limits" on institutional reform decrees and went beyond a "reasonable and necessary implementation[] of federal law," improperly depriving officials of their designated executive powers. *Horne v. Flores*, 557 U.S. 433, 450 (2009) (citation modified).

## 2

The October order also violated the Immigration and Nationality Act. One part of that law—8 U.S.C. § 1252(f)(1)—strips lower federal courts of power to issue certain class-based injunctions:

> Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of [8 U.S.C. §§ 1221–1232], other than with respect to the

application of such provisions to an individual alien against whom proceedings under [those provisions] have been initiated.

Generally, this statute "prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Aleman Gonzalez*, 596 U.S. at 550.

The majority holds that the government waived objection to the October order based on § 1252(f)(1), noting that the government in 2021 raised this statute before entering the consent decree and failed to argue the point again in opposition to plaintiffs' motion to modify. *Ante,* at 9–12. But entering a consent decree three years earlier is not a waiver of a § 1252(f)(1) objection to an injunction reaching outside the four corners of the decree. And even if the government forfeited this argument by failing to raise it below, we should reach it because the application of § 1252(f)(1) to this instance of institutional reform litigation involves (as discussed above) "concerns broader than those of the parties." *United States v. Ford*, 683 F.3d 761, 768 (7th Cir. 2012) (citation modified).

I agree with the majority's conclusion that, waiver or forfeiture aside, the October order ran afoul of § 1252(f)(1). See *ante*, at 14–15. On a class-wide basis, the order barred ICE from issuing I-200 field warrants pursuant to § 1226. And, as the majority also acknowledges, whether the district court was right about the lawfulness of ICE's I-200 procedure doesn't matter. Section 1252(f)(1) barred the district court from issuing class-wide injunctive relief affecting the operation of a covered provision (including § 1226) regardless of whether the government was properly interpreting that

provision. See *Aleman Gonzalez*, 596 U.S. at 554 (noting that a court's jurisdiction to entertain a request for class-wide injunctive relief does not depend on the merits of the claim).

The district court granted plaintiffs' extension request under Rule 60(b) after having found some non-I-200 violations of the decree and cited an ICE official's declaration that the government would no longer comply with the decree. But the district court understood ICE's I-200 warrant procedure to be a central aspect of the change in circumstances justifying a modification. The district court wrote that ICE's I-200 field warrant policy was an explicit attempt to circumvent the agreement's requirements. And about half of the violations of the decree that the court found in the October order involved an I-200 warrant. In short, a key justification supporting the court's modification of the decree was wrong. And because the district court committed errors of law, we should vacate and remand. See *United States v. Chaparro*, 956 F.3d 462, 474 (7th Cir. 2020); *Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1061 (7th Cir. 2016).

B

As discussed above, the October order was flawed because the district court failed to take account of the unique aspects of this institutional reform litigation and issued class-wide injunctive relief that was barred by § 1252(f)(1). The November order—requiring ICE to release hundreds of potential class members—suffered from the same two problems, and from two others. By failing to conduct individualized determinations as to whether the aliens at issue had been arrested in violation of the agreement, the district court violated the remedy provision of the consent decree. And the court erred in its interpretation of mandatory detention under § 1225. For any

of these reasons, we should vacate and remand the November order.

1

I agree with my colleagues that an initial, obvious problem with the November order is that it violates the terms of consent decree itself. *Ante*, at 50. The agreement's remedy provision authorized release from ICE custody for class members "upon a determination by the Parties or the Court … that [the] Class member was so arrested contrary to the terms of this Agreement." The district court bypassed this requirement entirely and instead ordered ICE to release hundreds of aliens with no analysis as to whether those detainees had been arrested in violation of the agreement. The district court abused its discretion by failing to adhere to the remedial terms of the consent decree.

2

The November order should also be vacated because the district court failed to consider the public interest and separation of powers aspects of the litigation. By ignoring the remedial terms of the decree, issuing class-wide relief barred by the INA, and ordering the government to comply with the previous administration's view of mandatory detention under 8 U.S.C. § 1225, the district court left little "leeway for democratic governance." *Evans*, 10 F.3d at 479. The court could have narrowly interpreted and enforced the decree to avoid "a premature confrontation between the judicial and executive branches." *All. to End Repression*, 742 F.2d at 1019. Instead, the court invoked its equitable discretion to grant wide-ranging relief that went beyond the only "substantial claim under federal law" (warrantless arrests under § 1357)

that supports the continued existence of the decree. *Evans*, 10 F.3d at 480. The district court should have approached plaintiffs' motion with "due regard for the separation of powers, the flexibility of equity, the ambiguity of the decree … the sensitivity and importance of the subject matter, and the limitations of judicial competence." *All. to End Repression*, 742 F.2d at 1019. The court did not do so, and that choice was error.

3

The November order violated § 1252(f)(1), the INA's bar on class-wide injunctive relief that enjoins operation of certain parts of the INA. In opposition to plaintiffs' motion, the government asserted that § 1225 (a provision covered by § 1252(f)(1)) required the detention of aliens arrested in the Chicago area. The district court disagreed and issued injunctive relief on a class-wide basis, requiring the government to release hundreds of detainees that, in ICE's view, the government had to detain under § 1225. That relief was barred by § 1252(f)(1).

The Supreme Court's decision in *Aleman Gonzalez* controls this case. 596 U.S. at 552–54. In *Aleman Gonzalez*, the government detained aliens pursuant to a covered provision. *Id.* at 547. The aliens filed suit; two district courts certified classes of similarly situated plaintiffs and then issued class-wide injunctive relief. *Id.* The Supreme Court found that the orders ran afoul of § 1252(f)(1). *Id.* at 548. The plaintiffs argued that § 1252(f)(1) only barred injunctions that interfered with the operation of a covered provision "as properly interpreted." *Id.* at 552. The Court rejected that argument, holding that jurisdiction to entertain a request for class-wide injunctive relief is not dependent on the merits of the claim. *Id.* at 554. In other

words, an injunction that interferes with a covered provision "is barred even if a court determines that the Government's 'operation' of a covered provision is unlawful or incorrect." *Al Otro Lado v. Exec. Off. for Immigr. Rev.*, 138 F.4th 1102, 1125 (9th Cir. 2025); see *N.S. v. Dixon*, 141 F.4th 279, 289 (D.C. Cir. 2025); *Arizona v. Biden*, 40 F.4th 375, 394 (6th Cir. 2022) (Sutton, C.J., concurring) ("§ 1252(f)(1) has the same force even when the National Government allegedly enforces the relevant statutes unlawfully.").

The same analysis applies to the November order. The district court issued class-wide injunctive relief, enjoining the government from operating § 1225's mandatory detention requirement in the way that ICE believed was lawful. That the district court disagreed with the government's interpretation of § 1225 doesn't matter.

My colleagues say that by entering the consent decree, the government waived argument that the November order violated § 1252(f)(1). That's wrong. When the litigation began, the government raised § 1252(f)(1) as a bar to the consent decree itself and then dropped that objection when it entered the agreement. But that means the government waived argument that the decree itself violated § 1252(f)(1)—it didn't forever bar the government from raising § 1252(f)(1) against any order implicating the injunction bar in a new way in this litigation. Similarly, the consent decree says the district court may provide equitable remedies to manage the decree, but that doesn't mean the government agreed that the district court could issue equitable remedies prohibited by the INA's injunction bar. The government squarely raised § 1252(f)(1) in opposition to the November order, and the district court ran afoul of that statute.

Judge Lee's attempt to explain why § 1252(f)(1) doesn't apply ignores the clear rule in *Aleman Gonzalez*. While my colleague acknowledges that § 1252(f)(1) bars injunctions that enjoin even the unlawful *operation* of a covered provision, Judge Lee reasons that operation is a limited concept, and so courts may freely decide whether a covered provision *applies* in the first instance. *Ante*, at 22. And because the plaintiffs "are not challenging the manner in which DHS is enforcing and implementing § 1225," my colleague says the issue here is whether § 1225 applies at all. *Id.* at 24.

One problem with this new rule is that it's contrary to *Aleman Gonzalez*. The Court did not distinguish between operation and application of covered provisions. 596 U.S. at 552–54. Instead, *Aleman Gonzalez* says unequivocally that the availability of class-wide injunctive relief is not dependent on the merits of the claim. *Id.* at 554. And even if Judge Lee's rule wasn't barred by *Aleman Gonzalez*, it is also unworkable. Every objection to the government's operation of a covered provision can be styled as a challenge to the applicability of the law. For instance, if § 1225, properly operated, doesn't authorize the detention of certain aliens, then § 1225 doesn't apply to those aliens. Judge Lee's approach authorizes plaintiffs and courts to make an easy end-run around *Aleman Gonzalez*, even in cases—like this one—where the government's interpretation is more than plausible. See *Buenrostro-Mendez v. Bondi*, 166 F.4th 494 (5th Cir. 2026) (agreeing with the government's interpretation of § 1225); *Avila v. Bondi*, 170 F.4th 1128 (8th Cir. 2026) (same).

Setting aside the novel distinction between operation and application, the rule from *Aleman Gonzalez* is already constrained in two ways. First, § 1252(f)(1) applies only to

covered provisions—the government cannot use the injunction bar against an order affecting only a non-covered provision. And second, even when the government asserts that an injunction interferes with a covered provision, the courts still play a role by deciding whether, *as a factual matter*, the injunction at issue enjoins or restrains the operation of that law as interpreted by the government, such that the order runs afoul of the injunction bar. See *Texas v. DHS*, 123 F.4th 186, 210 (5th Cir. 2024) ("The district court found as a factual matter that Defendants' duties [under covered provisions] would not be thwarted by the injunction."); *Al Otro Lado*, 138 F.4th at 1125 ("§ 1252(f)(1) does not prohibit an injunction simply because of collateral effects on a covered provision."); *Dixon*, 141 F.4th at 289 ("We disagree with N.S.'s argument that the injunction has only a collateral effect on [covered provisions.]"). In this case, the district court's order targets a covered provision—§ 1225—and there's no dispute that the injunction as a factual matter has more than collateral effects on that provision.

*Aleman Gonzalez* drew a bright line. If an injunction requires ICE to refrain from an action that, in the government's view, is required by § 1225, that injunction is barred even if a court decides that the government is wrong about the law. 596 U.S. at 551–54. The rule applies both when the government is a little and a lot wrong about its operation of a covered provision. And while that may seem like an extreme approach, recall that § 1252(f)(1) only bars class-wide injunctive relief. Faithfully applying *Aleman Gonzalez* does not insulate the government from judicial review—it simply means that courts must decide the lawfulness of government operation of covered provisions one case at a time.

The district court didn't do that here. The November order included class-wide injunctive relief enjoining the government from operating a covered provision—§ 1225—in a way that the government believes to be lawful. Even if the government was wrong about the proper operation of § 1225 (and it wasn't, as I discuss below), that doesn't matter. By issuing the injunction, the district court exceeded its jurisdiction under § 1252(f)(1). *Aleman Gonzalez*, 596 U.S. at 548.

4

Section 1252(f)(1) and the district court's other errors should have meant that we need not reach whether the government was right about mandatory detention under § 1225. But the government independently argued, setting § 1252(f)(1) aside, that the district court's order violated § 1225. The government is correct. The better reading of § 1225 is that the INA's mandatory detention provision applies to aliens arrested in the interior as well as to those encountered at the border.

Noting that § 1225 enters this case by way of the parties' consent decree, Judge Pryor contends that we must decide the meaning of mandatory detention under that provision by reference to what that term meant at the time the parties entered the decree. That's wrong for two reasons. First, as discussed above, this isn't a normal contract, and so strictly applying the usual contract interpretation rules is a mistake. Locking the government to a past interpretation of § 1225 is the approach that leaves the least "leeway for democratic governance." *Evans*, 10 F.3d at 479. Second, because mandatory detention is a legal term of art, its meaning when used in a contract is guided by its usage in the legal field. See *Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 46 (1998); *Bandak v. Eli Lilly and*

*Co. Retirement Plan*, 587 F.3d 798, 800 (7th Cir. 2009) ("The pre-sumption in interpreting a contract is that the meaning of a technical term is its technical meaning, and thus, if it is a technical legal term, its technical legal meaning.") (citation modified); see also Restatement (Second) of Contracts § 178 (1981) ("A promise or other term of an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable."). The parties bargained for a remedy—aliens arrested in violation of the decree who were not subject to mandatory detention would be released—that was tied to the statutory definition of mandatory detention under § 1225. They therefore agreed that the consent decree would be interpreted by reference to the actual meaning of § 1225, not what prior administrations may have thought that statute meant at one time or another. The question before us, then, is whether the November order violated the legal requirements of § 1225.

Section 1225 includes the following:

(2) Inspection of other aliens

(A) In general

[I]n the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title.

8 U.S.C. § 1225(b)(2)(A). The INA defines "alien" as "any person not a citizen or national of the United States," *id.* § 1101(a)(3), and "applicant for admission" as "[a]n alien present in the United States who has not been admitted or who arrives in the United States," *id.* § 1225(a)(1).

It's undisputed that, insofar as they were not citizens and were present in the United States without having been admitted, the aliens the district court ordered released in the November order were applicants for admission. Because these arrests occurred in the interior of the country, the issue we need to decide is this: does § 1225(b)(2)(A) require the detention of all applicants for admission not clearly entitled to admission (including those that ICE encounters in the interior of the country), or merely those present at the borders and ports of entry? The Supreme Court's decision in *Jennings v. Rodriguez*, 583 U.S. 281 (2018), generally discussed this area of the law, but the Court has yet to squarely confront the question. See *id.* at 287–89; *Avila*, 170 F.4th at 1136. And absent guidance from the Supreme Court, I interpret § 1225 by considering the text of the law, the context in which the provision appears, and the broader context of the statute. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). If the statutory language is unambiguous, the court should not look elsewhere. *Id.*

i

Focusing on the second clause of § 1225(b)(2)(A), plaintiffs, the district court, and Judge Lee want to draw a firm line between an alien seeking admission and an applicant for admission. But reading the whole of this provision shows that Congress didn't draw that line. See *Gustafson v. Alloyd Co.*, 513 U.S. 561, 570 (1995) (noting that statutes are read as a whole and not "as a series of unrelated and isolated provisions"). Instead, the statute simply uses different terms to refer to the same person. Section 1225(b)(2)(A) begins by referring to a singular "case" involving an applicant for admission and then refers to that same person as an alien seeking admission. Put differently, § 1225(b)(2)(A) includes a condition—an alien not

clearly entitled to admission must be detained—but it does not also create a separate requirement that the alien be actively seeking admission. See *Avila*, 170 F.4th at 1134–35 (noting that the grammatical structure of § 1225(b)(2)(A) does not indicate that seeking admission is an independent requirement); see also *Dubin v. United States*, 599 U.S. 110, 118 (2023) (observing that context can shed light on the meaning of terms that are, "in isolation, indeterminate"); *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991) ("Words are not pebbles in alien juxtaposition; they have only a communal existence; and not only does the meaning of each interpenetrate the other, but all in their aggregate take their purport from the setting in which they are used."). The law draws no distinction between applicants for admission and aliens seeking admission—it merely uses a different term to refer to the applicant for admission identified at the start of the sentence.

That applicant for admission and alien seeking admission share a definition also shows that § 1225(b)(2)(A) applies to aliens in the interior as well as those at the border. The statutory definition of "applicant for admission" is broad: "[a]n alien present in the United States who has not been admitted or who arrives in the United States … shall be deemed for purposes of this chapter an applicant for admission." 8 U.S.C. § 1225(a)(1). Anyone who is an applicant for admission is applying for admission. See *Applicant*, Merriam-Webster's Collegiate Dictionary (10th ed. 1994) (defining applicant as "one who applies"). And anyone who is applying for admission is seeking admission. Compare *Seek*, Merriam-Webster's Collegiate Dictionary (10th ed. 1994) (defining "seek" as "to go in search of"; "look for"; "to ask for"; "to try to acquire or gain"; "aim at"; and "to make an attempt"), with *Apply*, Merriam-Webster's Collegiate Dictionary (10th ed. 1994) (defining

"apply" as "to make an appeal or request esp. in the form of a written application"). That Congress chose to use a noun, applicant, and the present participle of the verb seek makes no difference, because by definition an applicant for admission is seeking admission—the terms mean the same thing.

It's true that "applicant for admission" is a term of art because it's defined by the statute, while "alien seeking admission" is not. It's also the case that "a definition which declares what a term means excludes any meaning that is not stated." *Stenberg v. Carhart*, 530 U.S. 914, 942 (2000) (citation modified). But "applicant for admission" is a defined term that also has an obvious, ordinary meaning. And because "an entirely artificial definition is rare," we typically expect the meaning of a definition to be "closely related to the ordinary meaning of the word being defined." Antonin Scalia & Bryan A. Garner, *Reading Law* 228 (2012); see *Delligatti v. United States*, 604 U.S. 423, 435 (2025) ("When choosing among interpretations of a statutory definition, the 'ordinary meaning' of the 'defined term' is an important contextual clue."). We need not abandon all reference to the ordinary meaning of applicant for admission, and so what we have here is a term of art that is synonymous with an undefined term—alien seeking admission. The law says that an alien present in the United States who has not been admitted or who arrives in the United States is an applicant for admission, 8 U.S.C. § 1225(a)(1), and applicants for admission are seeking admission. See *Buenrostro-Mendez*, 166 F.4th at 503 ("Because being an applicant ordinarily entails seeking something, it seems natural to use the words somewhat interchangeably."); *Avila*, 170 F.4th at 1134 (noting that the "ordinary meanings of the phrases 'applicant for admission' and 'seeking admission' are the same").

To sum up, reading § 1225(b)(2)(A) as a whole shows that Congress did not draw a distinction between two categories of aliens—it merely referred to the same person by using two different terms. That those terms share an ordinary meaning reinforces that conclusion. And because the statute applies to all applicants for admission, it is not limited merely to those actively seeking admission at the border or ports of entry. All applicants for admission, even those encountered in the interior of the country, are subject to mandatory detention unless they are clearly entitled to admission.

Judge Lee concludes that this interpretation creates superfluity in the law, but Congress is permitted to use synonyms in a statute. See *Tyler v. Cain*, 533 U.S. 656, 664 (2001); *Rimini St., Inc. v. Oracle USA, Inc.*, 586 U.S. 334, 346 (2019) ("Redundancy is not a silver bullet."). My colleague urges that plaintiffs' alternative interpretation—Congress excepted from mandatory detention all aliens who aren't actively seeking admission—allows "applicant for admission" and "alien seeking admission" to "do independent work." *Ante*, at 31. That's an understatement. Plaintiffs' preferred interpretation assigns "seeking admission" an immense workload—plaintiffs would use that term to carve an enormous exception into the law covering most of the aliens in the country. The words cannot bear the load, and we do not read statutes in this way. See *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (Congress "does not … hide elephants in mouseholes."). Moreover, plaintiffs' interpretation raises more questions than it answers. For instance, "at what point does an alien who enters unlawfully no longer actively desire admission?" *Chen v. Almodovar*, 25 Civ. 9670, 2026 WL 100761, at *9 (S.D.N.Y. Jan. 14, 2026). Plaintiffs have no answer, and their

approach would lead to difficult line drawing problems that judges are ill-equipped to solve.

Two other provisions within the same statute show that in § 1225(b)(2)(A) Congress simply used different words for the same set of people. First, § 1225(a)(5) says that "[a]n applicant for admission may be required to state under oath any information sought by an immigration officer regarding the purposes and intentions of the applicant *in seeking admission to the United States…*." 8 U.S.C. § 1225(a)(5) (emphasis added). This provision suggests that applicants for admission are necessarily seeking admission.

Second, § 1225(a)(3) says that "[a]ll aliens (including alien crewmen) who are applicants for admission *or otherwise seeking admission* or readmission to or transit through the United States shall be inspected by immigration officers." *Id.* § 1225(a)(3) (emphasis added). As Judge Lee acknowledges, see *ante*, at 35, one way to understand this provision is that the statute says that there are other ways to seek admission *besides* being an applicant for admission. And that necessarily implies that applicants for admission *are seeking admission*. See *Otherwise*, Black's Law Dictionary (12th ed. 2024) (defining "otherwise" as "[i]n a different way" and "in another manner"); see also *Villarreal v. R.J. Reynolds Tobacco Co.*, 839 F.3d 958, 964 (11th Cir. 2016) (en banc) (explaining that "or otherwise" means "the first action is a subset of the second action"); *Kleber v. CareFusion Corp.*, 914 F.3d 480, 482–83 (7th Cir. 2019) (same).

Attributing to Congress limitless powers of grammatical precision, Judge Lee explains that this isn't the only way to read § 1225(a)(3). *Ante*, at 35–38. But that doesn't matter, because the natural reading is also the most convincing. As

discussed above, applying and seeking are synonymous. And so while § 1225(a)(3) may technically link different parts of speech, Congress compared two concepts that were closely related: applying for and seeking admission. Section 1225(a)(3) supports the proposition that the detention requirement in § 1225(b)(2)(A) applies to all applicants for admission.

My colleague argues that other parts of § 1225 and the INA support his narrower reading of mandatory detention. *Ante*, at 33–35. But Judge Lee overstates the significance of these contextual clues and ignores those that cut the other way. For instance, my colleague reasons that because immigration inspections typically occur at the border, § 1225(b)(2)(A)'s mention of an "examining immigration officer" and the statute's many other references to inspections must mean that § 1225(b)(2)(A) only applies at the border. *Ante*, at 32–33. But the fact that most immigration inspections today occur at the border doesn't matter. The statute describes the inspection requirement and does not say that inspections only refer to an encounter that occurs at the border or in ports of entry. See 8 U.S.C. § 1225(a)(3). Judge Lee points to § 1225's title and headings, see *ante*, at 33–34, which reference "expedited removal of inadmissible arriving aliens." Yet § 1225(b)(2)(A) falls under a different heading: "[i]nspection by immigration officers." And the specific sub-headings of § 1225(b) support the government's interpretation. Section 1225(b)(1) says "Inspection of aliens arriving in the United States and certain other aliens who have not been admitted or paroled." The heading of § 1225(b)(2), by contrast—"Inspection of other aliens"— makes no reference to arriving aliens, which suggests that § 1225(b)(2)(A) applies to all applicants for admission. Another example: Judge Lee observes that neighboring statutory provisions concern the border and arriving aliens, see *ante*, at

34–35, but fails to mention § 1226, granting the Attorney General authority to arrest and detain aliens regardless of where or when they are encountered, and even authorizing state attorneys general (including those in interior states) to bring an action against the government if an alien harms state residents. *Id.* § 1226(a) & (f).

Some parts of § 1225 focus on arriving aliens (rather than those already within the country). See, e.g., § 1225(b)(1), (b)(2)(B)(i) & (iii), (b)(2)(C). But the statute's express attention to arriving aliens in other parts underscores the absence of that language in § 1225(b)(2)(A). Congress knew how to distinguish between arriving aliens and those already here. That Congress did not do so in § 1225(b)(2)(A) (by using, for instance, "arriving alien" rather than "alien seeking admission") suggests that an alien seeking admission is different than an arriving alien. *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 457–58 (2022) (discussing the meaningful-variation canon); see also *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 156 (2013) (noting that the canon is merely a rule of thumb). And § 1225(b)(2)(A) isn't the only part of the statute that reaches beyond the border, either. See, e.g., 8 U.S.C. § 1225(a)(3)–(5) (requirements for inspection, withdrawal of applications for admission, and statements that are not limited to arriving aliens or the border); *id.* § 1225(b)(1)(B)(i) (contemplating asylum interviews not at a port of entry).

Considering all the statutory evidence, the best reading of § 1225(b)(2)(A) is that (with limited statutory exceptions that aren't at issue in this case) it covers all applicants for admission, including those who have reached the interior of the United States without having gained lawful entry into the country. Had Congress wanted to grant different treatment to

those illegally inside the country as compared to those encountered at the border, it could have done so. Section 1225(b)(2)(A) draws no such distinction. That means all applicants for admission must be detained if they are not entitled to admission.

ii

To bolster plaintiffs' strained reading, Judge Lee points to the preceding versions of § 1225, legislative history, a contemporary amendment to the INA (the Laken Riley Act), and the ways in which past presidential administrations have used (and not used) § 1225. *Ante*, at 38–49. An initial problem with this approach is that because § 1225(b)(2)(A) is unambiguous, we should not consider other evidence outside the text itself. See *Robinson*, 519 U.S. at 340. But even if we consider this evidence, there is much to support the proposition that § 1225(b)(2)(A) applies to all applicants for admission.

Start with the prior versions of the INA. My colleague argues that because earlier iterations of § 1225(b)(2)(A) "expressly focused their attention on the arrival of noncitizens at the country's borders or ports of entry," Congress could not have intended to depart from that past practice without doing so explicitly. *Ante*, at 39–41. Judge Lee misreads this evidence. That past iterations of § 1225(b)(2)(A) expressly limited mandatory detention to arriving aliens makes the absence of such language in the current version of the statute significant. See *Saxon*, 596 U.S. at 457–58; *Sebelius*, 568 U.S. at 156. And while I agree that Congress does not make major changes to statutes through silence, see *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 465 (2017), this statute isn't silent. It says that all applicants for admission not entitled to admission shall be detained. 8 U.S.C. § 1225(b)(2)(A). And the sharp contrast

between that language and past iterations of this provision clarifies what Congress meant, and what it did not. See, e.g., Immigration and Nationality Act, Pub. L. No. 82-414, § 235(b), 66 Stat. 163, 199 (1952) ("Every alien … who may not appear to the *examining immigration officer at the port of arrival* to be clearly and beyond a doubt entitled to land shall be detained….") (emphasis added); Immigration Act of 1990, Pub. L. No. 101-649, § 235, 104 Stat. 4978, 5083 (1990) (same) (emphasis added). Citing these earlier iterations of the law, my colleague demands more, but we must faithfully apply the version of the law *as it is written now*, not as it used to be. We do not require Congress to underline and highlight every change, and § 1225(b)(2)(A) unambiguously requires the detention of aliens who have passed beyond our border areas.

Next, my colleague cites legislative history suggesting some in Congress understood § 1225(b)(2)(A) to only apply to aliens arriving in the United States. *Ante*, at 41–43. But as Judge Lee acknowledges, one of the overarching purposes of 1996 amendments to the INA (which added the current version of § 1225) was to eliminate disparities between the treatment of aliens arriving at the border and those already in the country. *Id.* at 42; see *Torres v. Barr*, 976 F.3d 918, 928 (9th Cir. 2020) (Congress enacted § 1225(a)(1) to "ensure[] that all immigrants who have not been lawfully admitted, regardless of their physical presence in the country, are placed on equal footing in removal proceedings."); *Buenrostro-Mendez*, 166 F.4th at 508 n.15 (reasoning that it would have been odd if Congress had preserved an exception from mandatory detention authority for aliens in the interior because that was "one of the most significant advantages available for unlawful entrants"). By my colleague's own account, then, the legislative history is ambiguous. And in any event, legislative history is

not the law. *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 523 (2018); *United States v. Chaoqun*, 107 F.4th 715, 737 (7th Cir. 2024) (Kirsch, J., concurring) (legislative history is "too malleable to be a reliable tool for deciphering legislative purpose"); Frank H. Easterbrook, *Foreword* to Scalia & Garner, *Reading Law* xxii (2012) ("Legislative intent is a fiction …. Every legisla*tor* has an intent … and the legisla*ture* is a collective body that does not have a mind[.]").

The recent passage of the Laken Riley Act, which requires the detention of aliens who commit certain offenses, doesn't support plaintiffs' position. The relevant amendment was to § 1226(c), but that provision applies more broadly than § 1225(b)(2)(A), carries with it distinct parole consequences, and in short "applies a different set of penalties to a broader group of aliens" than § 1225(b)(2)(A). *Avila*, 170 F.4th at 1137. The government's interpretation of § 1225(b)(2)(A) does not make the Laken Riley Act superfluous, and any overlap is understandable given that Congress passed the Act "at a time when the Executive was still declining to exercise its full enforcement authority [under § 1225]." *Buenrostro-Mendez*, 166 F.4th at 505; see also *Barton v. Barr*, 590 U.S. 222, 239 (2020) (explaining that "redundancies are common in statutory drafting" and that sometimes Congress wants to be "doubly sure"); *Atl. Richfield Co. v. Christian*, 590 U.S. 1, 14 n.5 (2020) (recognizing that Congress may take "a belt and suspenders approach").

Finally, Judge Lee points out that past administrations have not read § 1225 to require detentions of aliens who are not arriving at the border or ports of entry. But the government's past practice did not convey rights to those who benefitted or forever bind future administrations to an incorrect

interpretation of the law. See *Rust v. Sullivan*, 500 U.S. 173, 186 (1991) ("An agency is not required to establish rules of conduct to last forever."); *Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers, Local 3 v. N.L.R.B.*, 843 F.2d 770, 776 (3d Cir. 1988) (agency interpretations are not "frozen in concrete"). For nearly three decades, the government used this statute in the way plaintiffs urge is the only way it can be used. *Ante*, at 47. But the present administration is now invoking broader authority under § 1225(b)(2)(A), and it is our task to give that provision its fairest reading, regardless of past practice. See *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) (noting that "the longstanding practice of the government—like any other interpretive aid—can inform a court's determination of what the law is," but cannot "supersede" judicial judgment). As explained above, the fairest reading of § 1225(b)(2)(A) is that all applicants for admission not entitled to be admitted or falling into the exceptions must be detained.

## C

The district court overstepped. When that happens, our job is simple—we send the case back to the district court for it to correctly apply the law. See *Chaparro*, 956 F.3d at 474. For the many reasons discussed above, we should vacate both orders and remand the case to the district court.